**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHATTERPLUG, INC., a Delaware corporation,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>DIGITAL INTENT, LLC, an Illinois limited liability company, and KINDRED HEALTHCARE, INC., a Delaware corporation,<br><br>　　　　　　Defendants. | Case Number:<br><br>Judge:<br><br>Magistrate Judge:<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiff ChatterPlug, Inc. ("ChatterPlug"), for its Complaint against Defendant Digital Intent, LLC ("Digital Intent") and Defendant Kindred Healthcare, Inc. ("Kindred") (collectively, the "Defendants"), alleges as follows:

**INTRODUCTION**

1.　　　　ChatterPlug is a Chicago-based, pioneering, start-up company.

2.　　　　ChatterPlug has researched, designed and developed and owns innovative healthcare management technology focused on patient engagement and experience.

3.　　　　ChatterPlug's innovative healthcare management technology at issue in this action is its PatientConnecter™ platform and tools.

4.　　　　Tools are also known as ("*a.k.a.*") products, applications or apps.

5.　　　　Authorized users can access and use the PatientConnecter™ platform and tools through electronic devices, such as smartphones, tablets, laptop computers and desktop computers.

6.　　　　ChatterPlug has researched, designed and developed and owns two versions of

1

PatientConnecter™: (a) PatientConnecter™ -- Acute Care ("PatientConnecter™ -- AC") and (b) PatientConnecter™ -- Post-Acute Care ("PatientConnecter™ -- PAC") (collectively, "PatientConnecter™").

7. ChatterPlug trade secrets relating to PatientConnecter™ – PAC (the "PatientConnecter™ -- PAC Trade Secrets") are at issue in this action.

8. Other ChatterPlug commercial rights and interests relating to PatientConnecter™ – PAC are at issue in this action.

9. Each version of PatientConnecter™ is designed for a particular patient population, namely, acute care patients and post-acute care patients, respectively.

10. In general, acute care is care for a serious or traumatic illness, injury or condition.

11. In general, acute care is provided at a physician's office or in an inpatient hospital setting.

12. In general, post-acute care is specialized, follow-up care that a patient receives after receiving acute care.

13. In general, post-acute care addresses various needs, including physical and emotional needs, of patients.

14. In general, post-acute care includes therapeutic, rehabilitative and nursing care and health management services.

15. In general, post-acute care is focused on a patient's needs while transitioning from an acute care setting, such as a hospital, to his or her home and the community in general.

16. In general, post-acute care is provided in various settings, such as long-term acute care hospitals, inpatient rehabilitation facilities, skilled nursing facilities and patients' homes.

## NATURE OF THE
## ACTION

17.     ChatterPlug solely and exclusively owns all rights, title and interests in and to PatientConnecter™ -- AC.

18.     ChatterPlug solely and exclusively owns all rights, title and interests in and to intellectual property, including trade secrets, relating to or embodied in PatientConnecter™ -- AC.

19.     ChatterPlug solely and exclusively owns all rights, title and interests in and to PatientConnecter™ -- PAC.

20.     ChatterPlug solely and exclusively owns all rights, title and interests in and to intellectual property, including trade secrets, relating to or embodied in PatientConnecter™ – PAC.

21.     Defendants have engaged and are engaging in deceptive and dishonest conduct, including acts and failures to act, in violation of Illinois, Delaware and Federal law.

22.     Defendants have caused, are causing and, unless (a) enjoined, (b) ordered to specifically perform and comply with applicable duties, obligations, limitations and prohibitions or (c) both, will continue to cause harm to ChatterPlug, its intellectual property rights and interests and its other commercial rights and interests.

23.     ChatterPlug brings this action to (a) protect and enforce its trade secret rights and interests, (b) protect and enforce its commercial rights and interests, including its contractual rights and interests, and (c) otherwise remedy the harms that Defendants have caused, are causing and, unless enjoined, ordered to specifically perform and comply with applicable duties, obligations, limitations and prohibitions or both, will continue to cause.

24.     Defendants' deceptive, dishonest and unlawful conduct comprises (a) Digital Intent's and Kindred's misappropriation of PatientConnecter™ -- PAC Trade Secrets, in violation

of the Illinois Trade Secrets Act (ITSA), 765 ILCS § 1065/1, *et seq.*, (b) Digital Intent's breaches of a written contract and an oral contract, in violation of Delaware law and Illinois law, respectively, (c) Kindred's tortious interference with the written contract, in violation of Illinois law, and (d) Digital Intent's and Kindred's unfair competition, namely, false designations of origin based on reverse palming off of, for example, (i) Maxwell, an application that Digital Intent and Kindred jointly and publicly have disclosed, promoted and marketed, and (ii) ChatterPlug's PatientConnecter™ -- PAC prototype, which is also one of the PatientConnecter™ -- PAC Trade Secrets (the "PatientConnecter™ -- PAC Prototype"), in violation of the Lanham Act, 15 U.S.C. § 1125(a).

25.    Defendants' deceptive, dishonest and unlawful conduct comprises Digital Intent's and Kindred's individual acts and failures to act and their joint acts and failures to act.

26.    The written contract that Digital Intent has breached and is breaching is the Mutual Confidentiality Agreement between ChatterPlug and Digital Intent (the "MCA").

27.    The MCA is the only written contract between ChatterPlug and Digital Intent.

28.    A true and accurate copy of the MCA is provisionally filed, under seal, as Confidential Exhibit A to this Complaint.

29.    The MCA is the contract with which Kindred tortiously has interfered and is interfering.

30.    ChatterPlug has sustained and is sustaining substantial financial, economic, goodwill and reputational harm as a result of the Defendants' deceptive, dishonest and unlawful conduct.

31.    ChatterPlug will continue to sustain substantial financial, economic, goodwill and reputational harm unless each of the Defendants is held accountable for its and their deceptive,

dishonest and unlawful conduct and appropriate injunctive, specific performance and monetary relief is awarded to ChatterPlug.

32.     ChatterPlug has sustained and is sustaining irreparable harm, for which there is no adequate remedy at law, as a result of the Defendants' deceptive, dishonest and unlawful conduct.

33.     ChatterPlug will continue to sustain irreparable harm, for which there is no adequate remedy at law, unless each of the Defendants is (a) enjoined from engaging in deceptive, dishonest and unlawful conduct, (b) ordered to specifically perform and comply with applicable duties, obligations, limitations and prohibitions or (c) both.

34.     Digital Intent and Kindred, individually and jointly, have gained, are gaining and will continue to gain substantial financial, economic, goodwill and reputational benefits as a result of its and their deceptive, dishonest and unlawful conduct.

35.     Digital Intent and Kindred, individually and jointly, have been, are being and will continue to be unjustly enriched as a result of its and their deceptive, dishonest and unlawful conduct.

36.     In this action, ChatterPlug seeks, among other things, injunctive relief, namely, preliminary and permanent injunctions, specific performance, monetary damages, exemplary damages, punitive damages, enhanced damages, attorneys' fees, costs, pre-judgment interest and post-judgment interest.

## **PARTIES**

37.     ChatterPlug is a corporation organized and existing under the laws of Delaware.

38.     ChatterPlug's principal place of business is located at 71 West Hubbard Street, Unit 3105, Chicago, Illinois 60654.

39.     ChatterPlug's Founder and Chief Executive Officer is JoyAnn Book ("Book").

40.     ChatterPlug's Chief Technology Officer, *a.k.a.* its Chief Technologist, is Daniel

Hixon ("Hixon").

41.     Book and Hixon are ChatterPlug's only employees.

42.     Digital Intent is a limited liability company organized and existing under the laws of Illinois.

43.     Digital Intent's principal place of business is located at 118 North Peoria Street, 3N, Chicago, Illinois 60607.

44.     Digital Intent provides consulting services and support to businesses.

45.     Digital Intent has engaged and is engaging in deceptive, dishonest and unlawful conduct through several of its employees, including (a) Joseph Dwyer, *a.k.a.* Joe Dwyer ("Dwyer"), a Digital Intent member, (b) Jordan Katz ("Katz"), a Digital Intent Managing Director, (c) Sean Johnson ("Johnson"), a Digital Intent member, (d) Matt Anarde ("Anarde"), a Digital Intent member, and (e) Adam Drake ("Drake"), Digital Intent's Product & Strategy Lead.

46.     Kindred is a corporation organized and existing under the laws of Delaware.

47.     Kindred's principal place of business is located at 680 South Fourth Street, Louisville, Kentucky 40202-2412.

48.     A true and accurate copy of a March 15, 2016 Kindred presentation entitled "Shaping the Future of Care for an Aging America" is attached as Exhibit B.

49.     In 2015, Kindred provided healthcare services to more than 1,040,000 patients and residents in the United States, including many patients and residents in Illinois.  (Exhibit B, p. 3.)

50.     Kindred offers and provides healthcare services at 2,692 U.S. facilities, including multiple facilities in Illinois.  (Exhibit B, pp. 3, 6.)

51.     In 2015, Kindred's revenue was approximately $ 7.2 billion after intercompany

6

eliminations.  (Exhibit B, pp. 5, 29.)

52.    Kindred's website is located at www.kindredhealthcare.com.

53.    A true and accurate copy of a portion of Kindred's website is attached as Exhibit C.

54.    Kindred is the largest provider of post-acute care in the United States.   (Exhibit C.)

55.    Kindred provides post-acute care through an extensive U.S. network comprising (a) transitional care hospitals, (b) nursing and rehabilitation centers, (c) rehabilitation facilities, (d) hospice facilities and (e) assisted living facilities.  (Exhibit C.)

56.    Kindred also provides post-acute care in patients' homes.  (Exhibit C.)

57.    A true and accurate copy of "Kindred's Chicago Integrated Care Market Services" brochure is attached as Exhibit D.

58.    Kindred (a) owns and operates five transitional care hospitals in Illinois, (b) provides healthcare services at and through each of those five hospitals, (c) owns and operates three home care facilities in Illinois, (d) provides healthcare and hospice services through each of those three facilities, (e) is affiliated with three other home care facilities in Illinois and (f) provides healthcare and hospice services through each of those three other facilities.  (Exhibit D, p. 2.)

59.    RehabCare's website is located at www.rehabcare.com.

60.    A true and accurate copy of a portion of RehabCare's website is attached as Exhibit E.

61.    Kindred Rehabilitation Services (KRS) is a division of Kindred.  (Exhibit E, p. 1.)

62.    Kindred, through KRS, offers and provides rehabilitation services, including

therapy.

63.     In 2015, KRS provided therapy to more than 556,000 patients in the United States, including many patients in Illinois.  (Exhibit B, p. 4.)

64.     In 2015, KRS's revenue was approximately $ 1.5 billion.  (Exhibit B, pp. 5, 29.)

65.     RehabCare is a division of Kindred and a part of KRS.  (Exhibit E, p. 1.)

66.     Kindred, through RehabCare, offers and provides rehabilitation services, including physical, occupational and speech therapy.  (Exhibit E, p. 1.)

67.     RehabCare offers and provides physical, occupational and speech therapy to post-acute care patients.  (Exhibit E, pp. 1-2.)

68.     RehabCare is the largest rehabilitation company in the United States.  (Exhibit E, p. 2.)

69.     RehabCare offers and provides physical, occupational and speech therapy in 46 States, including Illinois.  (Exhibit B, p. 3; Exhibit E, p. 2.)

70.     RehabCare offers and provides physical, occupational and speech therapy at over 1,700 U.S. facilities, including multiple facilities in Illinois.  (Exhibit B, p. 6.)

71.     RehabCare offers and provides physical, occupational and speech therapy at multiple skilled nursing facilities in Illinois.   (Exhibit E, p. 2.)

72.     RehabCare has a U.S. network comprising nearly 18,000 physical, occupational and speech therapists, including many therapists in Illinois.  (Exhibit E, p. 2.)

## JURISDICTION AND VENUE

73.     This Court has subject matter jurisdiction over the Lanham Act-based unfair competition claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

74.     This Court has subject matter jurisdiction over all other claims pursuant to 28 U.S.C. §§ 1338(b) and 1367.

75.     Venue is proper in this district pursuant to 28 U.S.C. § 1391.

76.     This Court has personal jurisdiction over Digital Intent at least because (a) Digital Intent is organized and exists under the laws of Illinois, (b) Digital Intent maintains its principal place of business in Illinois, (c) Digital Intent continuously and systematically transacts business from and within Illinois and (d) Digital Intent has committed and continues to commit illegal acts within Illinois, illegally has failed to perform and comply with and continues to illegally fail to perform and comply with its duties, obligations, limitations and prohibitions within Illinois and wrongfully has benefitted and continues to benefit from those acts and failures within Illinois and (e) harm to ChatterPlug, an Illinois citizen, and its rights and interests has arisen out of and been caused by Digital Intent's acts and failures, including Digital Intent's acts and failures within Illinois.

77.     This Court has personal jurisdiction over Kindred at least because (a) Kindred continuously and systematically transacts business from and within Illinois, (b) on information and belief, Kindred has committed and continues to commit illegal acts within Illinois, illegally has failed to perform and comply with and continues to illegally fail to perform and comply with its duties, obligations, limitations and prohibitions within Illinois and wrongfully has benefitted and continues to benefit from those acts and failures within Illinois and (c) harm to ChatterPlug, an Illinois citizen, and its rights and interests has arisen out of and been caused by Kindred's acts and failures, including Kindred's acts and failures within Illinois.

## **FACTUAL BACKGROUND**

### **ChatterPlug's People**

78.     In 2003, Book received a Bachelor of Arts degree in Business Administration, with a Finance emphasis, and a Bachelor of Arts degree in Spanish from Pacific University.

79.     In February 2013, Book received an Accomplishment with Distinction for

9

Technology Entrepreneurship from the Stanford Graduate School of Business Online Venture Lab.

80.    In September 2015, Book received her Master of Business Administration in Healthcare Enterprise Management and Innovation and Entrepreneurship from the Kellogg School of Management at Northwestern University ("Kellogg").

81.    In 2006, Hixon earned a Bachelor of Arts degree in Business Economics from the University of California, Santa Barbara.

82.    In 2010, Book and Christopher Book formed ChatterPlug.

83.    On November 1, 2010, Book entered into a written Non-Disclosure Agreement (NDA) with ChatterPlug.

84.    Pursuant to Book's NDA, she assumed confidentiality obligations.

85.    On November 4, 2010, Book entered into a written Proprietary Information and Inventions Agreement (PIIA) with ChatterPlug.

86.    Pursuant to Book's PIIA, Book (a) assigned to ChatterPlug, among other things, all rights, title and interests in and to all intellectual property, including trade secrets, that she, as a ChatterPlug employee, made, conceived or reduced to practice and (b) assumed confidentiality obligations.

87.    On February 16, 2011, Hixon entered into a written NDA with ChatterPlug.

88.    Pursuant to Hixon's NDA, he assumed confidentiality obligations.

89.    On March 4, 2011, Hixon entered into a written PIIA with ChatterPlug.

90.    Pursuant to Hixon's PIIA, Hixon (a) assigned to ChatterPlug, among other things, all rights, title and interests in and to all intellectual property, including trade secrets, that he, as a ChatterPlug employee, made, conceived or reduced to practice and (b) assumed confidentiality obligations.

91.     Book has four years of experience (a) managing targeted patient engagement and experience projects, (b) strategically engaging patients and managing patient experiences, (c) researching, designing and developing tools, including prototypes, embodying targeted patient engagement and experience techniques and (d) implementing the tools and executing their roll-outs.

92.     Book has six years of experience (a) managing targeted customer engagement and experience projects, (b) strategically engaging customers and managing customer experiences, (c) researching, designing and developing tools, including prototypes, embodying targeted customer engagement and experience techniques and (d) implementing the tools and executing their roll-outs.

93.     One of Book's passions is filling the digital void in healthcare by increasing access and two-way secure communication cross-device.

94.     Hixon has more than ten years of experience in professional web development.

95.     Hixon's experience includes platform architecture development, web application development and mobile application programming interfaces development.

**ChatterPlug's Platforms And Tools**

96.     The first platform that ChatterPlug researched, designed and developed was a customer engagement and experience platform known as ChatterPlug®.

97.     ChatterPlug® enables creation, management and tracking of on-site and off-site customer engagement and experiences.

98.     ChatterPlug® is designed to be embedded, in whole or in part, into a business' branded mobile application.

99.     ChatterPlug® is designed to be used by high consumer touch vertical businesses,

such as retail, hospitality and food and beverage businesses.

100. The next platform that ChatterPlug researched, designed and developed was PatientConnecter™.

101. ChatterPlug invested significant time, money and effort to research, design and develop PatientConnecter™ -- AC.

102. From April 2012 through April 2013 ChatterPlug, through Book and Hixon, researched, designed and developed PatientConnecter™ -- AC.

103. From April 2012 through April 2013, ChatterPlug, through Book and Hixon, invested thousands of hours researching, designing and developing PatientConnecter™ -- AC.

104. From April 2012 through April 2013, ChatterPlug invested hundreds of thousands of dollars researching, designing and developing PatientConnecter™ -- AC.

105. Since April 2013, ChatterPlug, through Book and Hixon, has continued to research, design and develop and, in the process, refine PatientConnecter™ -- AC.

106. ChatterPlug, through Book and Hixon, has invested and continues to invest additional time, money and effort to refine PatientConnecter™ -- AC.

**PatientConnecter™ -- AC's Commercial Success**

107. Since 2013, ChatterPlug has marketed PatientConnecter™ -- AC primarily to healthcare providers.

108. ChatterPlug's marketing efforts relating to PatientConnecter™ -- AC have been successful, as two healthcare providers have entered into written PatientConnecter™ -- AC subscription agreements.

109. Pursuant to a PatientConnecter™ -- AC subscription agreement, a subscriber is licensed to use PatientConnecter™ -- AC, subject to certain terms and conditions, including

confidentiality obligations and payment of fees to ChatterPlug.

110. PatientConnecter™ -- AC has been and is commercially successful.

## ChatterPlug And Digital Intent Are Introduced

111. In the Fall of 2014, while Book was still a Kellogg student, one of Book's courses was Building Innovation, Teams and Cultures.

112. Dwyer was the lecturer of the Building Innovation, Teams and Cultures course.

113. In addition to being a Digital Intent employee and member, Dwyer is an adjunct lecturer at Kellogg.

114. During Dwyer's September 23, 2014 lecture in the Building Innovation, Teams and Culture course, Dwyer stated to the entire class that Digital Intent was involved in a healthcare-related project.

115. After the September 23, 2014 lecture, Dwyer stated to Book that the healthcare-related project called for Digital Intent to provide the client with a product for connecting with its patients (the "Kindred Project").

116. After the September 23, 2014 lecture, Book stated to Dwyer that PatientConnecter™ would be a fit for the Kindred Project.

117. On September 23, 2014, Dwyer asked Book to send him a description of PatientConnecter™.

118. On September 30, 2014, Book sent to Dwyer a high level description of PatientConnecter™.

119. On September 30, 2014, Dwyer asked Book if he could forward the high level description of PatientConnecter™ to the client.

120. On September 30, 2014, Book authorized Dwyer to provide the high level

description of PatientConnecter™ to the client.

121.    On information and belief, on or around September 30, 2014, Dwyer provided the high level description of PatientConnecter™ to Kindred.

122.    On October 1, 2014, Digital Intent, through Katz, sent ChatterPlug an e-mail.

123.    A true and accurate copy of Digital Intent's October 1, 2014 e-mail to ChatterPlug is attached as Exhibit F.

124.    In Digital Intent's October 1, 2014 e-mail, Katz called PatientConnecter™ "interesting" and stated that (a) he "[w]ould love to here [*sic*] more and possibly go through a demo" and (b) PatientConnecter™ "[m]ight have some synergies with the project Joe [Dwyer] spoke about."  (Exhibit F.)

**ChatterPlug And Digital Intent Discuss Working Together**

125.    On October 16, 2014, ChatterPlug and Digital Intent met at Digital Intent's offices.

126.    Book attended the October 16, 2014 meeting on ChatterPlug's behalf, and Dwyer, Katz and Drake attended the October 16, 2014 meeting on Digital Intent's behalf.

127.    During the October 16, 2014 meeting, ChatterPlug and Digital Intent discussed working together on the Kindred Project and options for structuring a ChatterPlug and Digital Intent relationship.

128.    On November 4, 2014, ChatterPlug, through Book, and Digital Intent, through Katz, again met and further discussed working together on the Kindred Project and options for structuring a ChatterPlug and Digital Intent relationship.

**ChatterPlug And Digital Intent Enter Into The MCA**

129.    Following the November 4, 2014 meeting, ChatterPlug sent Digital Intent (a) additional, high level information about PatientConnecter™ and (b) the unsigned MCA.

130.   On November 14, 2014, Digital Intent, through Katz, sent ChatterPlug an e-mail.

131.   A true and accurate copy of Digital Intent's November 14, 2014 e-mail to ChatterPlug is attached as Exhibit G.

132.   In Digital Intent's November 14, 2014 e-mail, Katz stated to Book that he had a "crazy idea [that] has to do with this massive project we have with Kindred and how you might be able to lead that and patient connector [*sic*, PatientConnecter™]."  (Exhibit G.)

133.   On November 18, 2014, ChatterPlug and Digital Intent entered into the MCA. (Confidential Exhibit A (MCA).)

134.   Pursuant to the MCA, ChatterPlug granted Digital Intent limited authorization to engage in certain conduct involving ChatterPlug Confidential Information, including ChatterPlug trade secrets.  (Confidential Exhibit A (MCA), p. 1 and §§ 1-3, 5.)

135.   Pursuant to the MCA, Digital Intent is bound by limitations and prohibitions and has assumed duties and obligations involving ChatterPlug Confidential Information, including ChatterPlug trade secrets.  (Confidential Exhibit A (MCA), p. 1 and §§ 1-3, 5.)

**As Of November 18, 2014, The Kindred Project Was Stuck In Neutral**

136.   No later than November 18, 2014, Digital Intent knew that, on its own, it was and would be unable to provide an innovative, digital, post-acute care, patient engagement and experience tool to Kindred.

137.   No later than November 18, 2014, Digital Intent knew that, in order to provide an innovative, digital, post-acute care, patient engagement and experience tool to Kindred, it would need to work with a company possessing appropriate technology, leadership, knowledge, experience, acumen and skills to design and develop that tool.

138.   On information and belief, no later than November 18, 2014, Digital Intent

publicly was seeking, through a posting, an entrepreneur in residence (EIR).

139.     Digital Intent's website is located at www.digintent.com.

140.     A true and accurate copy of Digital Intent's EIR posting, from Digital Intent's website, is attached as Exhibit H.

141.     As of November 18, 2014, Digital Intent was seeking an EIR "to lead a multi-phased innovation partnership with a Fortune 500 healthcare provider."  (Exhibit H.)

142.     The EIR posting's reference to "a Fortune 500 healthcare provider" is a reference to Kindred.  (Exhibit H.)

143.     A true and accurate copy of a portion of Digital Intent's website is attached as Exhibit I.

144.     Currently, Digital Intent's website identifies Kindred as a Digital Intent client. (Exhibit I.)

145.     The EIR posting's reference to "a multi-phased innovation partnership with a Fortune 500 healthcare provider" is a reference to the Kindred Project. (Exhibit H.)

146.     The EIR posting sought a person to "lead" the Kindred Project, including the Kindred Project team.    (Exhibit H.)

147.     In particular, as of November 18, 2014, Digital Intent was seeking an EIR that "will lead a team to successfully build a product/business that solves a meaningful problem for the healthcare provider [*i.e.*, Kindred]."  (Exhibit H.)

148.     As of November 18, 2014, Digital Intent was seeking an EIR who had "practical experience leading businesses, working with customers and building technology products/systems in a fast-paced environment" and was an "open-minded, creative" leader "who will persistently and passionately seek novel solutions to complex problems in the healthcare industry."  (Exhibit

16

H.)

149.    The EIR posting sought a person with, among other things, "7-10+ years total experience in combination of management consulting, technology and startups" and "[h]ealthcare experience."  (Exhibit H.)

150.    As of November 18, 2014, the Kindred Project's "thesis" was only "loosely defined." (Exhibit H.)

151.    As of November 18, 2014, Digital Intent contemplated merely that the Kindred Project would have four phases: (1) "Strategy, research and customer development[,]" (2) "Concept and product definition – including prototyping[,]" (3) "Product development and execution" and (4) "Value capture, manufacturing and scaling a business[.]"  (Exhibit H.)

152.    As of November 18, 2014, the Kindred Project needed definition and direction.

153.    As of November 18, 2014, Digital Intent had not designed or developed any prototype in connection with the Kindred Project.

154.    As of November 18, 2014, Digital Intent had not designed or developed any tool, product or application, *a.k.a.* app, in connection with the Kindred Project.

**ChatterPlug And Digital Intent Explore Working Together**

155.    On November 19, 2014, ChatterPlug, through Book, and Digital Intent, through Katz, met at Digital Intent's offices and further discussed the Kindred Project.

156.    During the November 19, 2014 meeting, Katz reiterated to Book that Digital Intent wanted an EIR to lead the Kindred Project.

157.    On November 25, 2014, Book and Digital Intent employees Katz and Drake met at Digital Intent's offices and further discussed the Kindred Project.

158.    During the November 25, 2014 meeting, Book demonstrated PatientConnecter™

-- AC to Digital Intent employees Katz, Drake and Dwyer.

159. Since no later than December 8, 2014, Digital Intent has known and currently knows that PatientConnecter™ brings and will bring significant value to the Kindred Project.

160. On December 9, 2014, ChatterPlug, through Book, and Digital Intent, through Katz, Dwyer and Anarde, met at Digital Intent's offices and further discussed the Kindred Project.

161. During a December 9, 2014 meeting, Book demonstrated PatientConnecter™ – AC to Anarde.

162. On December 12, 2014, ChatterPlug, through Book, and Digital Intent, through Katz and Dwyer, met at Digital Intent's offices and further discussed the Kindred Project.

**ChatterPlug Commences Work On The Kindred Project**

163. On December 15, 2014, ChatterPlug, through Book, commenced work on the Kindred Project, subject to the MCA.

164. Beginning on December 15, 2014, ChatterPlug, through Book, (a) led the Kindred Project, subject to the MCA, and (b) managed and consulted on the Kindred Project, subject to the MCA.

165. On December 17, 2014, Book began working out of Digital Intent's offices.

166. A true and accurate copy of Book's LinkedIn® profile is attached as Exhibit J.

167. On January 6, 2015, Digital Intent and ChatterPlug promoted PatientConnecter™, Book and her passions to Kindred.

168. Digital Intent and ChatterPlug promoted PatientConnecter™, Book and her passions to Kindred as follows: "As the Entrepreneur in Residence, JoyAnn leads healthcare technology initiatives at Digital Intent. JoyAnn is Founder of PatientConnecter[™], a patient experience management platform. Ms. Book is a Technology Executive with significant

experience in healthcare information technology (HIT), big data analytics, and digital customer and patient experience management technology. Ms. Book has a broad background from finance to technology and healthcare enterprise management. She has [led] disruptive innovation teams full-cycle, from user-based product design and product management through implementation and rollout." (Exhibit J.)

### PatientConnecter™ -- AC Becomes The Foundation For The Kindred Project

169. By mid-December 2014, Digital Intent was impressed with PatientConnecter™ -- AC, knew that PatientConnecter™ -- AC was ChatterPlug's established technology succeeding in the acute care space and confident that ChatterPlug could design and develop PatientConnecter™ -- PAC to succeed in the post-acute care space.

170. At all relevant times, ChatterPlug's vision was to use PatientConnecter™ -- AC as the foundation, and to design and develop PatientConnecter™ -- PAC as the specific solution, for the Kindred Project, subject to the MCA.

171. On or around December 18, 2014, PatientConnecter™ -- AC became the foundation for the Kindred Project, subject to the MCA.

### Digital Intent And Kindred's Master Services Agreement

172. On January 8, 2015, Digital Intent and Kindred entered into a Master Services Agreement (the "MSA").

### ChatterPlug Creates The PatientConnecter™ – PAC Tool Outline

173. ChatterPlug, through Book, was responsible for designing and developing PatientConnecter™ -- PAC, including the PatientConnecter™ -- PAC Tool.

174. On January 23, 2015, Book began designing and developing the PatientConnecter™ -- PAC Tool by beginning an outline of the PatientConnecter™ -- PAC Tool

(the "PatientConnecter™ -- PAC Tool Outline").

175.     During the period January 23, 2015 through February 18, 2015, Book created the PatientConnecter™ -- PAC Tool Outline and, as part of that process, created preliminary portions of the PatientConnecter™ -- PAC Tool Outline.

176.     On February 18, 2015, Book completed the PatientConnecter™ -- PAC Tool Outline.

177.     In creating the PatientConnecter™ -- PAC Tool Outline, Book relied upon and applied her (a) substantial and unique knowledge, experience, acumen and skills in the healthcare, enterprise software and patient engagement and experience fields and (b) substantial, intimate and unique knowledge of and experience with PatientConnecter™.

178.     There is no company, other than ChatterPlug, capable of legitimately relying upon and applying Book's (a) substantial and unique knowledge, experience, acumen and skills in the healthcare, enterprise software and patient engagement and experience fields and (b) substantial, intimate and unique knowledge of and experience with PatientConnecter™.

179.     The PatientConnecter™ -- PAC Tool Outline could not have been properly created, acquired or duplicated by any other company or individual, particularly under the Kindred Project time constraints, without a substantial investment of time, money and effort to attempt to locate or replicate, without any guarantee of success, a company or individual with knowledge, experience, acumen and skills sufficiently comparable to the knowledge, experience, acumen and skills of ChatterPlug, including Book.

180.     The preliminary portions of the PatientConnecter™ -- PAC Tool Outline are and set forth ChatterPlug Confidential Information.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

181.     The preliminary portions of the PatientConnecter™ -- PAC Tool Outline set forth

preliminary PatientConnecter™ – PAC Tool elements.

182.    Book included certain preliminary PatientConnecter™ – PAC Tool elements in the PatientConnecter™ -- PAC Tool Outline.

183.    ChatterPlug solely and exclusively owns all rights, title and interests in and to (a) the preliminary portions of the PatientConnecter™ -- PAC Tool Outline and (b) the Confidential Information, including the preliminary PatientConnecter™ – PAC Tool elements, set forth therein. (Confidential Exhibit A (MCA), §§ 1 and 3.)

184.    The PatientConnecter™ -- PAC Tool Outline is and sets forth ChatterPlug Confidential Information.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

185.    The PatientConnecter™ -- PAC Tool Outline sets forth PatientConnecter™ -- PAC Tool elements.

186.    ChatterPlug solely and exclusively owns all rights, title and interests in and to the PatientConnecter™ -- PAC Tool Outline and the Confidential Information, including the PatientConnecter™ – PAC Tool elements, set forth therein.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

187.    On February 18, 2015, ChatterPlug, through Book, disclosed the PatientConnecter™ -- PAC Tool Outline to Digital Intent and, in particular, Katz.

188.    At all relevant times, Digital Intent has known, and Digital Intent currently knows, that (a) the preliminary portions of the PatientConnecter™ -- PAC Tool Outline are and set forth ChatterPlug Confidential Information, (b) the preliminary portions of the PatientConnecter™ -- PAC Tool Outline set forth preliminary PatientConnecter™ – PAC Tool elements, (c) ChatterPlug solely and exclusively owns all rights, title and interests in and to (i) the preliminary portions of the PatientConnecter™ -- PAC Tool Outline and (ii) the Confidential Information, including the

preliminary PatientConnecter™ – PAC Tool elements, set forth therein, (d) the PatientConnecter™ -- PAC Tool Outline is and sets forth ChatterPlug Confidential Information, (e) the PatientConnecter™ -- PAC Tool Outline sets forth PatientConnecter™ -- PAC Tool elements and (f) ChatterPlug solely and exclusively owns all rights, title and interests in and to the PatientConnecter™ -- PAC Tool Outline and the Confidential Information, including the PatientConnecter™ -- PAC Tool elements, set forth therein. (Confidential Exhibit A (MCA), §§ 1 and 3.)

189.　On February 19, 2015, Book led a meeting at Digital Intent's offices.

190.　The February 19, 2015 meeting attendees were (a) Book, (b) Digital Intent employees Katz and Annie Bogert (Bogert) in person and (c) Digital Intent employee Winston Fassett (Fassett) by phone.

191.　During the February 19, 2015 meeting, ChatterPlug, through Book, again disclosed the PatientConnecter™ -- PAC Tool Outline to Digital Intent and, in particular, Katz, Bogert and Fassett.

**ChatterPlug Creates The PatientConnecter™ – PAC Tool Spreadsheet**

192.　On February 19, 2015, ChatterPlug, through Book, created a spreadsheet (the "PatientConnecter™ -- PAC Tool Spreadsheet").

193.　In creating the PatientConnecter™ -- PAC Tool Spreadsheet, Book relied upon and applied her (a) substantial and unique knowledge, experience, acumen and skills in the healthcare, enterprise software and patient engagement and experience fields and (b) substantial, intimate and unique knowledge of and experience with PatientConnecter™.

194.　The PatientConnecter™ – PAC Tool Spreadsheet could not have been properly created, acquired or duplicated by any other company or individual, particularly under the Kindred

Project time constraints, without a substantial investment of time, money and effort to attempt to locate or replicate, without any guarantee of success, a company or individual with knowledge, experience, acumen and skills sufficiently comparable to the knowledge, experience, acumen and skills of ChatterPlug, including Book.

195.    The PatientConnecter™ -- PAC Tool Spreadsheet is and sets forth ChatterPlug Confidential Information.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

196.    The PatientConnecter™ -- PAC Tool Spreadsheet sets forth PatientConnecter™ – PAC Tool elements.

197.    ChatterPlug solely and exclusively owns all rights, title and interests in and to the PatientConnecter™ -- PAC Tool Spreadsheet and the Confidential Information, including the PatientConnecter™ – PAC Tool elements, set forth therein.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

198.    On February 20, 2015, ChatterPlug, through Book, disclosed the PatientConnecter™ – PAC Tool Spreadsheet to Digital Intent and, in particular, Katz and Fassett.

199.    At all relevant times, Digital Intent has known, and Digital Intent currently knows, that (a) the PatientConnecter™ -- PAC Tool Spreadsheet is and sets forth ChatterPlug Confidential Information, (b) the PatientConnecter™ -- PAC Tool Spreadsheet sets forth PatientConnecter™ – PAC Tool elements and (c) ChatterPlug solely and exclusively owns all rights, title and interests in and to the PatientConnecter™ -- PAC Tool Spreadsheet and the Confidential Information, including the PatientConnecter™ – PAC Tool elements, set forth therein.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

**ChatterPlug Designs And Develops The PatientConnecter™ – PAC Tool**

200.    The PatientConnecter™ -- PAC Tool comprises elements set forth in the

PatientConnecter™ -- PAC Tool Outline and elements set forth in the PatientConnecter™ -- PAC Tool Spreadsheet.

201.    On February 19, 2015, Book finished designing and developing the PatientConnecter™ -- PAC Tool.

202.    Book insightfully designed and developed the PatientConnecter™ -- PAC Tool to be compatible with the commercially successful and proven PatientConnecter™ platform.

203.    In designing and developing the PatientConnecter™ – PAC Tool, Book relied upon and applied her (a) substantial and unique knowledge, experience, acumen and skills in the healthcare, enterprise software and patient engagement and experience fields and (b) substantial, intimate and unique knowledge of and experience with PatientConnecter™.

204.    The PatientConnecter™ – PAC Tool could not have been properly designed, developed, acquired or duplicated by any other company or individual, particularly under the Kindred Project time constraints, without a substantial investment of time, money and effort to attempt to locate or replicate, without any guarantee of success, a company or individual with knowledge, experience, acumen and skills sufficiently comparable to the knowledge, experience, acumen and skills of ChatterPlug, including Book.

205.    The PatientConnecter™ -- PAC Tool is ChatterPlug Confidential Information and a ChatterPlug trade secret.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

206.    ChatterPlug solely and exclusively owns all rights, title and interests in and to the PatientConnecter™ -- PAC Tool.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

207.    At all relevant times, Digital Intent has known, and Digital Intent currently knows, that (a) the PatientConnecter™ -- PAC Tool is ChatterPlug Confidential Information, (b) the PatientConnecter™ -- PAC Tool is a ChatterPlug trade secret and (c) ChatterPlug solely and

exclusively owns all rights, title and interests in and to the PatientConnecter™ -- PAC Tool. (Confidential Exhibit A (MCA), §§ 1 and 3.)

### ChatterPlug Discloses How PatientConnecter™ -- PAC Would Be Configured

208.    On March 10, 2015, there were three Kindred Project meetings at Digital Intent's offices.

209.    Book, Digital Intent employees Katz, Drake and Johnson and two Digital Intent contractors attended the second March 10, 2015 meeting in person.

210.    On information and belief, Digital Intent employee Fassett attended the second March 10, 2015 meeting by phone.

211.    During the second March 10, 2015 meeting, ChatterPlug, through Book, explained how the PatientConnecter™ -- PAC Tool would be configured according to the PatientConnecter™ -- PAC Tool Outline.

212.    Digital Intent referred to the third March 10, 2015 meeting as the PatientConnecter™ meeting.

213.    Book, Digital Intent employees Katz, Drake and Johnson and, on information and belief, two Digital Intent contractors attended the March 10, 2015 PatientConnecter™ meeting in person.

214.    On information and belief, Digital Intent employee Fassett attended the March 10, 2015 PatientConnecter™ meeting by phone.

215.    During the March 10, 2015 PatientConnecter™ meeting, ChatterPlug, through Book, demonstrated PatientConnecter™ -- AC.

216.    During the March 10, 2015 PatientConnecter™ meeting, ChatterPlug, through Book, explained how PatientConnecter™ -- AC was and would be the foundation, and how

PatientConnecter™ -- PAC was and would be the specific solution, for the Kindred Project.

**ChatterPlug Designs And Develops The PatientConnecter™ -- PAC Prototype**

217. ChatterPlug, through Book, was responsible for designing and developing the PatientConnecter™ -- PAC Prototype.

218. On January 23, 2015, Book began designing and developing the PatientConnecter™ -- PAC Prototype.

219. Book's creation of the PatientConnecter™ -- PAC Tool Outline was part of ChatterPlug's process for designing and developing the PatientConnecter™ -- PAC Prototype.

220. Book used the PatientConnecter™ -- PAC Tool Outline when designing and developing the PatientConnecter™ -- PAC Prototype.

221. During the period March 9, 2015 through March 17, 2015, Book focused on designing and developing the PatientConnecter™ -- PAC Prototype and, as part of that process, designed and developed preliminary portions of the PatientConnecter™ -- PAC Prototype.

222. During the period March 10, 2015 through March 17, 2015, Digital Intent employee Johnson and a Digital Intent contractor provided ChatterPlug with graphic design support relating to the PatientConnecter™ -- PAC Prototype.

223. During the period March 10, 2015 through March 17, 2015, Book's design and development of the PatientConnecter™ -- PAC Prototype included directing, coordinating, supervising and controlling, with final decision-making authority, all graphic design work relating to the PatientConnecter™ -- PAC Prototype performed by Digital Intent employee Johnson or the Digital Intent contractor.

224. On March 17, 2015, Book finished designing and developing the PatientConnecter™ -- PAC Prototype.

225. Book insightfully designed and developed the PatientConnecter™ -- PAC Prototype to be compatible with the commercially successful and proven PatientConnecter™ platform.

226. In designing and developing the PatientConnecter™ -- PAC Prototype, Book relied upon and applied her (a) substantial and unique knowledge, experience, acumen and skills in the healthcare, enterprise software and patient engagement and experience fields and (b) substantial, intimate and unique knowledge of and experience with PatientConnecter™.

227. The PatientConnecter™ -- PAC Prototype could not have been properly designed, developed, acquired or duplicated by any other company or individual, particularly under the Kindred Project time constraints, without a substantial investment of time, money and effort to attempt to locate or replicate, without any guarantee of success, a company or individual with knowledge, experience, acumen and skills sufficiently comparable to the knowledge, experience, acumen and skills of ChatterPlug, including Book.

228. The preliminary portions of the PatientConnecter™ – PAC Prototype are and set forth ChatterPlug Confidential Information.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

229. Book included certain preliminary portions of the PatientConnecter™ – PAC Prototype in the PatientConnecter™ -- PAC Prototype.

230. ChatterPlug solely and exclusively owns all rights, title and interests in and to (a) the preliminary portions of the PatientConnecter™ -- PAC Prototype and (b) the Confidential Information set forth therein.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

231. The PatientConnecter™ -- PAC Prototype is ChatterPlug Confidential Information and a ChatterPlug trade secret.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

232. ChatterPlug solely and exclusively owns all rights, title and interests in and to the

PatientConnecter™ -- PAC Prototype. (Confidential Exhibit A (MCA), §§ 1 and 3.)

233. At all relevant times, Digital Intent has known, and Digital Intent currently knows, that (a) the preliminary portions of the PatientConnecter™ -- PAC Prototype are and set forth ChatterPlug Confidential Information, (b) ChatterPlug solely and exclusively owns all rights, title and interests in and to (i) the preliminary portions of the PatientConnecter™ -- PAC Prototype and (ii) the Confidential Information set forth therein, (c) the PatientConnecter™ -- PAC Prototype is ChatterPlug Confidential Information, (d) the PatientConnecter™ -- PAC Prototype is a ChatterPlug trade secret and (e) ChatterPlug solely and exclusively owns all rights, title and interests in and to the PatientConnecter™ -- PAC Prototype. (Confidential Exhibit A (MCA), §§ 1 and 3.)

### PatientConnecter™ – PAC Trade Secrets

234. The PatientConnecter™ -- PAC Trade Secrets at issue in this action are (a) the PatientConnecter™ -- PAC Tool and (b) the PatientConnecter™ -- PAC Prototype.

### The Time, Money And Effort ChatterPlug Invested In Designing And Developing The PatientConnecter™ -- PAC Trade Secrets

235. From December 2014 through March 2015, ChatterPlug, through Book, invested many dozens of hours designing and developing PatientConnecter™ -- PAC, including the PatientConnecter™ -- PAC Trade Secrets.

236. From December 2014 through March 2015, ChatterPlug invested tens of thousands of dollars designing and developing PatientConnecter™ -- PAC, including the PatientConnecter™ -- PAC Trade Secrets.

### Confidential Demonstration Of The PatientConnecter™ -- PAC Prototype

237. On March 17, 2015, there was a meeting at Digital Intent's offices.

238. The March 17, 2015 meeting attendees were (a) Kindred, through employees Jason

28

Zachariah (Zachariah), Mark Brown (Brown) and Angela Ciliberti-Riedling (Ciliberti-Riedling), (b) Digital Intent, through Dwyer, Johnson, Katz, Drake, Fassett and Bogert, and (c) ChatterPlug, through Book.

239.    Fassett telephonically attended the March 17, 2015 meeting.

240.    On March 17, 2015, Zachariah was the Chief Operating Officer and Senior Vice President of Kindred Hospital Rehabilitation Services (HRS).

241.    Kindred HRS is a Kindred division and a part of KRS.

242.    Currently, Zachariah is the Chief Operating Officer and Senior Vice President of Kindred HRS.

243.    On March 17, 2015, Brown was the Chief Operating Officer and Vice President of Operations of RehabCare.

244.    Currently, Brown is the Chief Operating Officer and Vice President of Operations of RehabCare.

245.    On March 17, 2015, Ciliberti-Riedling was the Senior Director, Information Systems of KRS.

246.    Currently, Ciliberti-Riedling is the Senior Director, Information Systems of KRS.

247.    During the March 17, 2015 meeting, ChatterPlug, through Book, authorized and oversaw a confidential demonstration of the PatientConnecter™ -- PAC Prototype.

248.    On March 17, 2015, Digital Intent knew, and since March 17, 2015 Digital Intent has known, that the March 17, 2015 demonstration of the PatientConnecter™ -- PAC Prototype was confidential.

249.    On March 17, 2015, Kindred knew, and since March 17, 2015 Kindred has known, that the March 17, 2015 demonstration of the PatientConnecter™ -- PAC Prototype was

confidential.

### Kindred's Reaction To The PatientConnecter™ -- PAC Prototype

250.    During the March 17, 2015 meeting, Kindred expressed excitement about the PatientConnecter™ -- PAC Prototype.

251.    On March 19, 2015, Kindred, through Brown, again expressed excitement about the PatientConnecter™ -- PAC Prototype.

252.    On March 25, 2015, Kindred, through Amanda Dye (Dye), who was then the Director of Sales & Marketing for Kindred HRS and Operations Consultant for RehabCare, again expressed excitement about the PatientConnecter™ -- PAC Prototype.

253.    Currently, Dye is the Director of Sales & Marketing for Kindred HRS and Operations Consultant for RehabCare.

254.    On March 17, 2015, the PatientConnecter™ -- PAC Prototype became critical to Digital Intent's efforts to solidify and expand its commercial relationship with Kindred, including continuation and expansion of the Kindred Project.

255.    As a result of the PatientConnecter™ -- PAC Prototype, Digital Intent (a) gained credibility with and the trust and confidence of Kindred, thereby enabling continuation and expansion of the Kindred Project, (b) solidified and expanded its commercial relationship with Kindred, including continuation and expansion of the Kindred Project, and (c) realized and is realizing corresponding benefits and opportunities, including at least corresponding financial, economic, goodwill and reputational benefits and opportunities.

### Digital Intent Abruptly Terminates ChatterPlug

256.    On information and belief, Kindred currently is aware of the MCA.

257.    On information and belief, since no later than March 26, 2015, Kindred has been

aware of the MCA.

258.     On March 26, 2015, Digital Intent abruptly and without any warning indicated to ChatterPlug that Digital Intent wanted to terminate ChatterPlug from the Kindred Project.

259.     On March 31, 2015, ChatterPlug requested that Digital Intent not use any of ChatterPlug's files.

260.     ChatterPlug's files include ChatterPlug Confidential Information, such as the PatientConnecter™ – PAC Trade Secrets.

261.     On April 1, 2015, Digital Intent terminated ChatterPlug from the Kindred Project.

262.     Digital Intent terminated ChatterPlug from the Kindred Project without cause.

263.     Digital Intent terminated ChatterPlug from the Kindred Project without legitimate explanation.

264.     Since April 1, 2015, ChatterPlug has not been involved with the Kindred Project.

265.     Since April 1, 2015, ChatterPlug and Digital Intent have not had any legitimate business discussions.

266.     On April 3, 2015, ChatterPlug reminded Digital Intent not to use any of ChatterPlug's files.

**Digital Intent's Knowledge Of The PatientConnecter™ – PAC Trade Secrets**

267.     Since February 20, 2015, Digital Intent has known of the PatientConnecter™ – PAC Tool.

268.     Since March 17, 2015, Digital Intent has known of the PatientConnecter™ -- PAC Prototype.

**Kindred's Knowledge Of The PatientConnecter™ – PAC Trade Secrets**

269.     Since March 17, 2015, Kindred has known of the PatientConnecter™ -- PAC

Prototype.

270. On information and belief, since no later than March 26, 2015, Kindred has known that (a) the PatientConnecter™ – PAC Prototype is ChatterPlug Confidential Information, (b) the PatientConnecter™ – PAC Prototype is a ChatterPlug trade secret and (c) ChatterPlug solely and exclusively owns all rights, title and interests in and to the PatientConnecter™ -- PAC Prototype. (Confidential Exhibit A (MCA), §§ 1 and 3.)

271. On information and belief, Kindred currently knows that (a) the PatientConnecter™ – PAC Prototype is ChatterPlug Confidential Information, (b) the PatientConnecter™ – PAC Prototype is a ChatterPlug trade secret and (c) ChatterPlug solely and exclusively owns all rights, title and interests in and to the PatientConnecter™ -- PAC Prototype. (Confidential Exhibit A (MCA), §§ 1 and 3.)

272. On information and belief, since no later than March 26, 2015, Kindred has known of the PatientConnecter™ -- PAC Tool.

273. On information and belief, Kindred currently knows of the PatientConnecter™ -- PAC Tool.

274. On information and belief, since no later than March 26, 2015, Kindred has known that (a) the PatientConnecter™ – PAC Tool is ChatterPlug Confidential Information, (b) the PatientConnecter™ – PAC Tool is a ChatterPlug trade secret and (c) ChatterPlug solely and exclusively owns all rights, title and interests in and to the PatientConnecter™ -- PAC Tool. (Confidential Exhibit A (MCA), §§ 1 and 3.)

275. On information and belief, Kindred currently knows that (a) the PatientConnecter™ – PAC Tool is ChatterPlug Confidential Information, (b) the PatientConnecter™ – PAC Tool is a ChatterPlug trade secret and (c) ChatterPlug solely and exclusively owns all rights, title and

interests in and to the PatientConnecter™ -- PAC Tool.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

### Digital Intent And Kindred Know That ChatterPlug Owns PatientConnecter™

276.   At all relevant times, Digital Intent has known and currently knows that ChatterPlug solely and exclusively owns all rights, title and interests in and to (a) PatientConnecter™, including PatientConnecter™ -- PAC, (b) intellectual property embodied in or relating to PatientConnecter™, including the PatientConnecter™ -- PAC Trade Secrets, and (c) any related material, as set forth in the MCA.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

277.   On information and belief, at all relevant times, Kindred has known and currently knows that ChatterPlug solely and exclusively owns all rights, title and interests in and to (a) PatientConnecter™, including PatientConnecter™ -- PAC, (b) intellectual property embodied in or relating to PatientConnecter™, including the PatientConnecter™ -- PAC Trade Secrets, and (c) any related material, as set forth in the MCA.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

278.   At all relevant times, Digital Intent has known and currently knows that it does not own, does not have a license to and does not possess any right, title or interest, except for very limited, non-commercial rights under the MCA, in or to (a) PatientConnecter™, including PatientConnecter™ -- PAC, (b) any intellectual property embodied in or relating to PatientConnecter™, including the PatientConnecter™ -- PAC Trade Secrets, or (c) any related material, as set forth in the MCA.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

279.   On information and belief, at all relevant times, Kindred has known and currently knows that it does not own, does not have a license to and does not possess any right, title or interest in or to (a) PatientConnecter™, including PatientConnecter™ -- PAC, (b) any intellectual property embodied in or relating to PatientConnecter™, including the PatientConnecter™ -- PAC

Trade Secrets, or (c) any related material, as set forth in the MCA. (Confidential Exhibit A (MCA), §§ 1 and 3.)

**Each Of The PatientConnecter™ – PAC Trade Secrets Is Sufficiently Secret To Derive Economic Value**

280. On information and belief, as of April 1, 2015, each of the PatientConnecter™ -- PAC Trade Secrets was known to only ChatterPlug, Digital Intent and Kindred.

281. Since April 1, 2015, ChatterPlug has not disclosed either or both of the PatientConnecter™ -- PAC Trade Secrets to any other person.

282. On information and belief, neither of the PatientConnecter™ -- PAC Trade Secrets is, or at least as of April 1, 2015, neither of the PatientConnecter™ -- PAC Trade Secrets was, generally known to other persons, such as (a) other healthcare providers, (b) other companies in or serving the healthcare industry, (c) companies in any other industry or (d) any individuals unaffiliated with ChatterPlug, Digital Intent or Kindred, who can obtain economic value from its disclosure or use.

283. Each of the PatientConnecter™ -- PAC Trade Secrets is, or at least as of April 1, 2015 was, sufficiently secret.

284. Each of the PatientConnecter™ -- PAC Trade Secrets derives actual economic value from its sufficient secrecy.

285. Actual economic value that the PatientConnecter™ -- PAC Tool derives from its secrecy includes ChatterPlug being able to establish or enhance its goodwill, reputation and appeal, with or among one or more actual or prospective business partners, investors or clients, as a pioneering start-up company with an innovative, digital, post-acute care, patient engagement and experience tool having corresponding intellectual property, including trade secret, protection.

286. Actual economic value that the PatientConnecter™ -- PAC Prototype derives from

its secrecy includes ChatterPlug being able to establish or enhance its goodwill, reputation and appeal, with or among one or more actual or prospective business partners, investors or clients, as a pioneering start-up company with an innovative, digital, post-acute care, patient engagement and experience prototype having corresponding intellectual property, including trade secret, protection.

287.    Actual economic value that the PatientConnecter™ -- PAC Tool derives from its secrecy includes ChatterPlug being able to offer to an actual or prospective business partner, investor or client, on a first-to-market basis, an innovative, digital, post-acute care, patient engagement and experience tool having corresponding intellectual property, including trade secret, protection.

288.    Actual economic value that the PatientConnecter™ -- PAC Prototype derives from its secrecy includes ChatterPlug being able to offer to an actual or prospective business partner, investor or client, on a first-to-market basis, an innovative, digital, post-acute care, patient engagement and experience prototype having corresponding intellectual property, including trade secret, protection.

289.    Actual economic value that each of the PatientConnecter™ -- PAC Trade Secrets derives from its secrecy includes enabling ChatterPlug, a ChatterPlug partner, as Digital Intent was, or both to gain credibility with and the trust and confidence of an actual or prospective client, such as Kindred.

290.    Actual economic value that each of the PatientConnecter™ -- PAC Trade Secrets derives from its secrecy includes enabling ChatterPlug, a ChatterPlug partner, as Digital Intent was, or both to establish, solidify or expand, or solidify and expand, a commercial relationship with an actual or prospective client, such as Kindred, including continuation and expansion of an

actual project, such as the Kindred Project.

291.    Actual economic value that each of the PatientConnecter™ -- PAC Trade Secrets derives from its secrecy includes enabling ChatterPlug, a ChatterPlug partner, as Digital Intent was, or both to realize financial, economic, goodwill and reputational benefits and opportunities from or relating to an actual project, such as the Kindred Project.

292.    Actual economic value that the PatientConnecter™ -- PAC Tool derives from its secrecy includes providing a post-acute healthcare provider, such as Kindred, that uses the PatientConnecter™ -- PAC Tool a head start, with corresponding savings of time, money and effort and elimination or mitigation of risk of failure, and, as such, a competitive advantage over other post-acute healthcare providers that lack an innovative, digital, post-acute care, patient engagement and experience tool.

293.    Actual economic value that the PatientConnecter™ -- PAC Prototype derives from its secrecy includes providing a post-acute healthcare provider, such as Kindred, that uses the PatientConnecter™ -- PAC Prototype a head start, with corresponding savings of time, money and effort and elimination or mitigation of risk of failure, and, as such, a competitive advantage over other post-acute healthcare providers that lack an innovative, digital, post-acute care, patient engagement and experience prototype.

294.    Actual economic value that the PatientConnecter™ -- PAC Tool derives from its secrecy includes enabling a post-acute healthcare provider, such as Kindred, that first announces, introduces, launches or offers a tool embodying, copied from, substantially derived from or derived from the PatientConnecter™ -- PAC Tool to uniquely promote and market itself to, for example, actual and prospective payers, partners, including hospitals, medical professionals, including physicians, and patients and their respective families and caregivers as a provider of an innovative,

digital, post-acute care, patient engagement and experience tool and, in the process, meaningfully distinguish itself from other post-acute healthcare providers, establish or enhance its goodwill, reputation and appeal, increase its share price or some combination thereof.

295.   Actual economic value that the PatientConnecter™ -- PAC Prototype derives from its secrecy includes enabling a post-acute healthcare provider, such as Kindred, that first announces, introduces, launches or offers a tool embodying, copied from, substantially derived from or derived from the PatientConnecter™ -- PAC Prototype to uniquely promote and market itself to, for example, actual and prospective payers, partners, including hospitals, medical professionals, including physicians, and patients and their respective families and caregivers as a provider of an innovative, digital, post-acute care, patient engagement and experience tool and, in the process, meaningfully distinguish itself from other post-acute healthcare providers, establish or enhance its goodwill, reputation and appeal, increase its share price or some combination thereof.

296.   Actual economic value that the PatientConnecter™ -- PAC Tool derives from its secrecy includes enabling a post-acute healthcare provider, such as Kindred, that offers a tool embodying, copied from, substantially derived from or derived from the PatientConnecter™ -- PAC Tool to realize, during at least the head start period, economic benefits, including being better and uniquely positioned to (a) be considered as the post-acute healthcare provider by prospective post-acute care patients, their respective families and caregivers, (b) be selected as the post-acute healthcare provider by prospective post-acute care patients, their respective families and caregivers, thereby generating revenue, (c) increase rates of converting prospective post-acute care patients into actual post-acute care patients, thereby generating revenue, (d) increase rates of retaining patients, as they progress through the post-acute healthcare provider's overall system,

facilities and programs, thereby generating revenue, (e) achieve quicker, more lasting and better overall post-acute care patient outcomes, which, in turn, generate outcome-based revenue, where applicable, (f) achieve more lasting and better overall post-acute care patient outcomes and, as a result, reduce readmissions, thereby reducing costs, (g) attract prospective partners, including hospitals, (h) increase rates of converting prospective partners, including hospitals, into actual partners, thereby generating revenue, and (i) increase rates of retaining actual partners, including hospitals, thereby generating revenue.

297. Actual economic value that the PatientConnecter™ -- PAC Prototype derives from its secrecy includes enabling a post-acute healthcare provider, such as Kindred, that offers a tool embodying, copied from, substantially derived from or derived from the PatientConnecter™ -- PAC Prototype to realize during at least the head start period, economic benefits, including being better and uniquely positioned to (a) be considered as the post-acute healthcare provider by prospective post-acute care patients, their respective families and caregivers, (b) be selected as the post-acute healthcare provider by prospective post-acute care patients, their respective families and caregivers, thereby generating revenue, (c) increase rates of converting prospective post-acute care patients into actual post-acute care patients, thereby generating revenue, (d) increase rates of retaining patients, as they progress through the post-acute healthcare provider's overall system, facilities and programs, thereby generating revenue, (e) achieve quicker, more lasting and better overall post-acute care patient outcomes, which, in turn, generate outcome-based revenue, where applicable, (f) achieve more lasting and better overall post-acute care patient outcomes and, as a result, reduce readmissions, thereby reducing costs, (g) attract prospective partners, including hospitals, (h) increase rates of converting prospective partners, including hospitals, into actual partners, thereby generating revenue, and (i) increase rates of retaining actual partners, including

hospitals, thereby generating revenue.

298.     Each of the PatientConnecter™ -- PAC Trade Secrets derives potential economic value from its sufficient secrecy.

299.     Potential economic value that the PatientConnecter™ -- PAC Tool derives from its secrecy includes ChatterPlug potentially being able to establish or enhance its goodwill, reputation and appeal, with or among one or more actual or prospective business partners, investors or clients, as a pioneering start-up company with an innovative, digital, post-acute care, patient engagement and experience tool having corresponding intellectual property, including trade secret, protection.

300.     Potential economic value that the PatientConnecter™ -- PAC Prototype derives from its secrecy includes ChatterPlug potentially being able to establish or enhance its goodwill, reputation and appeal, with or among one or more actual or prospective business partners, investors or clients, as a pioneering start-up company with an innovative, digital, post-acute care, patient engagement and experience prototype having corresponding intellectual property, including trade secret, protection.

301.     Potential economic value that the PatientConnecter™ -- PAC Tool derives from its secrecy includes ChatterPlug potentially being able to offer to an actual or prospective business partner, investor or client, on a first-to-market basis, an innovative, digital, post-acute care, patient engagement and experience tool having corresponding intellectual property, including trade secret, protection.

302.     Potential economic value that the PatientConnecter™ -- PAC Prototype derives from its secrecy includes ChatterPlug potentially being able to offer to an actual or prospective business partner, investor or client, on a first-to-market basis, an innovative, digital, post-acute care, patient engagement and experience prototype having corresponding intellectual property,

including trade secret, protection.

303. Potential economic value that each of the PatientConnecter™ -- PAC Trade Secrets derives from its secrecy includes potentially enabling ChatterPlug, a ChatterPlug partner, as Digital Intent was, or both to gain credibility with and the trust and confidence of an actual or prospective client, such as Kindred.

304. Potential economic value that each of the PatientConnecter™ -- PAC Trade Secrets derives from its secrecy includes potentially enabling ChatterPlug, a ChatterPlug partner, as Digital Intent was, or both to establish, solidify or expand, or solidify and expand, a commercial relationship with an actual or prospective client, such as Kindred, including continuation and expansion of an actual project, such as the Kindred Project.

305. Potential economic value that each of the PatientConnecter™ -- PAC Trade Secrets derives from its secrecy includes potentially enabling ChatterPlug, a ChatterPlug partner, as Digital Intent was, or both to realize financial, economic, goodwill and reputational benefits and opportunities from or relating to an actual project, such as the Kindred Project.

306. Potential economic value that the PatientConnecter™ -- PAC Tool derives from its secrecy includes potentially providing a post-acute healthcare provider, such as Kindred, that uses the PatientConnecter™ -- PAC Tool a head start, with corresponding savings of time, money and effort and elimination or mitigation of risk of failure, and, as such, a competitive advantage over other post-acute healthcare providers that lack an innovative, digital, post-acute care, patient engagement and experience tool.

307. Potential economic value that the PatientConnecter™ -- PAC Prototype derives from its secrecy includes potentially providing a post-acute healthcare provider, such as Kindred, that uses the PatientConnecter™ -- PAC Prototype a head start, with corresponding savings of

time, money and effort and elimination or mitigation of risk of failure, and, as such, a competitive advantage over other post-acute healthcare providers that lack an innovative, digital, post-acute care, patient engagement and experience prototype.

308.    Potential economic value that the PatientConnecter™ -- PAC Tool derives from its secrecy includes potentially enabling a post-acute healthcare provider, such as Kindred, that first announces, introduces, launches or offers a tool embodying, copied from, substantially derived from or derived from the PatientConnecter™ -- PAC Tool to uniquely promote and market itself to, for example, actual and prospective payers, partners, including hospitals, medical professionals, including physicians, and patients and their respective families and caregivers as a provider of an innovative, digital, post-acute care, patient engagement and experience tool and, in the process, meaningfully distinguish itself from other post-acute healthcare providers, establish or enhance its goodwill, reputation and appeal, increase its share price or some combination thereof.

309.    Potential economic value that the PatientConnecter™ -- PAC Prototype derives from its secrecy includes potentially enabling a post-acute healthcare provider, such as Kindred, that first announces, introduces, launches or offers a tool embodying, copied from, substantially derived from or derived from the PatientConnecter™ -- PAC Prototype to uniquely promote and market itself to, for example, actual and prospective payers, partners, including hospitals, medical professionals, including physicians, and patients and their respective families and caregivers as a provider of an innovative, digital, post-acute care, patient engagement and experience tool and, in the process, meaningfully distinguish itself from other post-acute healthcare providers, establish or enhance its goodwill, reputation and appeal, increase its share price or some combination thereof.

310.    Potential economic value that the PatientConnecter™ -- PAC Tool derives from its

secrecy includes potentially enabling a post-acute healthcare provider, such as Kindred, that offers a tool embodying, copied from, substantially derived from or derived from the PatientConnecter™ -- PAC Tool to realize, during at least the head start period, economic benefits, including being better and uniquely positioned to (a) be considered as the post-acute healthcare provider by prospective post-acute care patients, their respective families and caregivers, (b) be selected as the post-acute healthcare provider by prospective post-acute care patients, their respective families and caregivers, thereby generating revenue, (c) increase rates of converting prospective post-acute care patients into actual post-acute care patients, thereby generating revenue, (d) increase rates of retaining patients, as they progress through the post-acute healthcare provider's overall system, facilities and programs, thereby generating revenue, (e) achieve quicker, more lasting and better overall post-acute care patient outcomes, which, in turn, generate outcome-based revenue, where applicable, (f) achieve more lasting and better overall post-acute care patient outcomes and, as a result, reduce readmissions, thereby reducing costs, (g) attract prospective partners, including hospitals, (h) increase rates of converting prospective partners, including hospitals, into actual partners, thereby generating revenue, and (i) increase rates of retaining actual partners, including hospitals, thereby generating revenue.

311. Potential economic value that the PatientConnecter™ -- PAC Prototype derives from its secrecy includes potentially enabling a post-acute healthcare provider, such as Kindred, that offers a tool embodying, copied from, substantially derived from or derived from the PatientConnecter™ -- PAC Prototype to realize during at least the head start period, economic benefits, including being better and uniquely positioned to (a) be considered as the post-acute healthcare provider by prospective post-acute care patients, their respective families and caregivers, (b) be selected as the post-acute healthcare provider by prospective post-acute care

patients, their respective families and caregivers, thereby generating revenue, (c) increase rates of converting prospective post-acute care patients into actual post-acute care patients, thereby generating revenue, (d) increase rates of retaining patients, as they progress through the post-acute healthcare provider's overall system, facilities and programs, thereby generating revenue, (e) achieve quicker, more lasting and better overall post-acute care patient outcomes, which, in turn, generate outcome-based revenue, where applicable, (f) achieve more lasting and better overall post-acute care patient outcomes and, as a result, reduce readmissions, thereby reducing costs, (g) attract prospective partners, including hospitals, (h) increase rates of converting prospective partners, including hospitals, into actual partners, thereby generating revenue, and (i) increase rates of retaining actual partners, including hospitals, thereby generating revenue.

312.     Economic benefits realized by a post-acute healthcare provider, such as Kindred, that offers a tool embodying, copied from, substantially derived from or derived from one or both of the PatientConnecter™ -- PAC Trade Secrets can be realized during and beyond the head start period because of, for example, one or more of (a) the post-acute healthcare provider meaningfully distinguishing itself from other post-acute healthcare providers by providing an innovative, digital, post-acute care, patient engagement and experience tool, (b) the establishment or enhancement of the post-acute healthcare provider's goodwill, reputation and appeal as an innovator and (c) the ability of the post-acute healthcare provider to renew or secure contracts with, for example, actual and prospective partners, including hospitals, that extend beyond the head start period.

**Digital Intent And Kindred Have Been And Are Being Unjustly Enriched**

313.     Digital Intent has been and is being unjustly enriched as a result of its deceptive, dishonest and unlawful conduct, including its misappropriation of each of the PatientConnecter™ – PAC Trade Secrets.

43

314.     Digital Intent's unjust enrichment includes: (a) without compensating ChatterPlug, Digital Intent accessing, using and disclosing components that are critical to commercializing an innovative, digital, post-acute care, patient engagement and experience tool, (b) Digital Intent avoiding significant investments of time, money and effort to attempt to research, design and develop an innovative, digital, post-acute care, patient engagement and experience tool, prototype or both, on its own or otherwise, with no guarantee of success within an acceptable period of time or otherwise, (c) Digital Intent (i) gaining credibility with and the trust and confidence of Kindred by timely delivering, on an accelerated basis, the PatientConnecter™ -- PAC Prototype and, on information and belief, the PatientConnecter™ – PAC Tool, thereby enabling continuation and expansion of the Kindred Project, (ii) solidifying and expanding the commercial relationship between Digital Intent and Kindred, including continuation and expansion of the Kindred Project, and (iii) realizing corresponding financial, economic, goodwill and reputational benefits and opportunities and (d) Digital Intent establishing goodwill, reputation and appeal as a healthcare innovator and realizing corresponding, including financial and economic, benefits and opportunities.

315.     Digital Intent's unjust enrichment has been and is to ChatterPlug's detriment.

316.     Digital Intent's unjust enrichment has violated and is violating the fundamental principles of justice, equity and good conscience.

317.     Kindred has been and is being unjustly enriched as a result of its deceptive, dishonest and unlawful conduct, including its misappropriation of each of the PatientConnecter™ – PAC Trade Secrets.

318.     Kindred's unjust enrichment includes: (a) without compensating ChatterPlug, Kindred accessing, using and disclosing components that are critical to commercializing an

innovative, digital, post-acute care, patient engagement and experience tool, (b) Kindred avoiding significant investments of time, money and effort to attempt to research, design and develop an innovative, digital, post-acute care, patient engagement and experience tool, prototype or both, on its own or otherwise, with no guarantee of success within an acceptable period of time or otherwise, (c) Kindred obtaining a head start and, as such, a competitive advantage over any other post-acute healthcare provider that lacks an innovative, digital, post-acute care, patient engagement and experience tool, prototype or both, (d) Kindred establishing goodwill, reputation and appeal as a provider of an innovative, digital, post-acute care, patient engagement and experience tool among, for example, actual and prospective payers, partners, including hospitals, medical professionals, including physicians, and post-acute care patients and their respective families and caregivers, and realizing corresponding, including financial and economic, benefits and opportunities and (e) without compensating ChatterPlug, Kindred becoming uniquely and better positioned to (i) be considered as the post-acute healthcare provider by prospective post-acute care patients, their respective families and caregivers, (ii) be selected as the post-acute healthcare provider by prospective post-acute care patients, their respective families and caregivers, thereby generating revenue, (iii) increase rates of converting prospective post-acute care patients into actual post-acute care patients, thereby generating revenue, (iv) increase rates of retaining patients, as they progress through the post-acute healthcare provider's overall system, facilities and programs, thereby generating revenue, (v) achieve quicker, more lasting and better overall post-acute care patient outcomes, which, in turn, generate outcome-based revenue, where applicable, (vi) achieve more lasting and better overall post-acute care patient outcomes and, as a result, reduce readmissions, thereby reducing costs, (vii) attract prospective partners, including hospitals, (viii) increase rates of converting prospective partners, including hospitals, into actual partners, thereby

generating revenue, and (ix) increase rates of retaining actual partners, including hospitals, thereby generating revenue.

319.    Kindred's unjust enrichment has been and is to ChatterPlug's detriment.

320.    Kindred's unjust enrichment has violated and is violating the fundamental principles of justice, equity and good conscience.

**Each Of The PatientConnecter™ – PAC Trade Secrets Has Been And Is The Subject Of Reasonable Protective Efforts**

321.    At all relevant times, ChatterPlug has made and is making reasonable efforts to maintain the secrecy or confidentiality of the PatientConnecter™ -- PAC Tool.

322.    At all relevant times, ChatterPlug has made and is making reasonable efforts to maintain the secrecy or confidentiality of the PatientConnecter™ -- PAC Prototype.

323.    The efforts that ChatterPlug has made and is making to maintain the secrecy or confidentiality of the PatientConnecter™ -- PAC Trade Secrets include (a) authorizing a person to access, disclose or use the PatientConnecter™ – PAC Trade Secrets only if the person is subject to confidentiality obligations, such as obligations imposed by (i) a confidential relationship, (ii) a written agreement, such as a confidentiality or non-disclosure agreement, or (iii) both (i) and (ii), (b) limiting such access to persons with a need to know, (c) limiting such disclosure to other authorized persons, (d) limiting such use to a specific purpose and (e) ensuring that there is a limited number of authorized persons.

**Protective Efforts Within ChatterPlug**

324.    Each of ChatterPlug's two employees, Book and Hixon, is authorized to (a) access and use the PatientConnecter™ – PAC Trade Secrets and (b) disclose the PatientConnecter™ – PAC Trade Secrets to other authorized persons.

325.    Book has a confidential employer-employee relationship with ChatterPlug.

326. Hixon has a confidential employer-employee relationship with ChatterPlug.

327. The confidential employer-employee relationship obligates each of Book and Hixon to, among other things, maintain the confidentiality of, among other things, the PatientConnecter™ – PAC Trade Secrets.

328. Pursuant to her written NDA, Book is obligated to, among other things, maintain the confidentiality of, among other things, the PatientConnecter™ -- PAC Trade Secrets.

329. Pursuant to her written PIIA, Book is obligated to, among other things, maintain the confidentiality of, among other things, the PatientConnecter™ -- PAC Trade Secrets.

330. Pursuant to his written NDA, Hixon is obligated to, among other things, maintain the confidentiality of, among other things, the PatientConnecter™ -- PAC Trade Secrets.

331. Pursuant to his written PIIA, Hixon is obligated to, among other things, maintain the confidentiality of, among other things, the PatientConnecter™ -- PAC Trade Secrets.

332. At all relevant times, ChatterPlug has followed and is following personal computer and electronic file security procedures to, among other things, maintain the confidentiality of the PatientConnecter™ -- PAC Trade Secrets.

333. ChatterPlug's personal computer and electronic file security procedures include the use of passwords, encryption, firewalls and remote wiping and locking of devices.

## Digital Intent's Limitations, Prohibitions, Duties And Obligations

334. ChatterPlug required Digital Intent to enter into the MCA in order to maintain the confidentiality of ChatterPlug Confidential Information, including ChatterPlug trade secrets.

335. The MCA and, in particular, Digital Intent's limitations, prohibitions, duties and obligations under the MCA, are part of ChatterPlug's efforts to maintain the confidentiality of the PatientConnecter™ -- PAC Trade Secrets.  (Confidential Exhibit A (MCA), §§ 1-2, 5.)

**Limited Authorization For Digital Intent And Kindred**

336. The PatientConnecter™ -- PAC Trade Secrets are not known outside of ChatterPlug, except insofar as (a) subject to the MCA, ChatterPlug disclosed the PatientConnecter™ -- PAC Trade Secrets to Digital Intent and (b) subject to the MCA and Digital Intent's multiple assurances to ChatterPlug that ChatterPlug's Confidential Information would be protected under the MSA, ChatterPlug, through Digital Intent, (i) demonstrated the PatientConnecter™ -- PAC Prototype to Kindred, in confidence, on March 17, 2015 and (ii) granted Kindred temporary and confidential access to the PatientConnecter™ -- PAC Prototype for several days after the March 17, 2015 meeting.

337. ChatterPlug granted Digital Intent limited authorization to engage in certain conduct involving ChatterPlug Confidential Information, including the PatientConnecter™ -- PAC Trade Secrets, only after the MCA was in effect and only because the MCA was and is in effect. (Confidential Exhibit A (MCA), p. 1 and §§ 1-3, 5.)

338. At all relevant times, Digital Intent has known, and Digital Intent currently knows, that without a written subscription or license agreement with ChatterPlug, neither Digital Intent nor Kindred is authorized to access, disclose or use any ChatterPlug Confidential Information, including the PatientConnecter™ -- PAC Trade Secrets, in connection with any commercial tool, product or application, *a.k.a.* app. (Confidential Exhibit A (MCA), § 6.9.)

339. On information and belief, at all relevant times, Kindred has known, and Kindred currently knows, that without a written subscription or license agreement with ChatterPlug, neither Digital Intent nor Kindred is authorized to access, disclose or use any ChatterPlug Confidential Information, including the PatientConnecter™ -- PAC Trade Secrets, in connection with any commercial tool, product or application, *a.k.a.* app. (Confidential Exhibit A (MCA), § 6.9.)

340.    Neither Digital Intent nor Kindred has entered into a written subscription or license agreement with ChatterPlug.

341.    Digital Intent never has been authorized, and is not authorized, to allow public access to or publicly disclose or use any ChatterPlug Confidential Information, including the PatientConnecter™ -- PAC Trade Secrets.

342.    At all relevant times, Digital Intent has known, and Digital Intent currently knows, that it never has been authorized, and is not authorized, to allow public access to or publicly disclose or use any ChatterPlug Confidential Information, including the PatientConnecter™ -- PAC Trade Secrets.

343.    On information and belief, at all relevant times, Kindred has known, and Kindred currently knows, that (a) Book is a ChatterPlug founder, (b) ChatterPlug is a separate entity from Digital Intent, (c) ChatterPlug owns PatientConnecter™, (d) the PatientConnecter™ – PAC Prototype is (i) ChatterPlug Confidential Information and (ii) a ChatterPlug trade secret, (e) the March 17, 2015 PatientConnecter™ – PAC Prototype demonstration was confidential, (f) Kindred's temporary access to the PatientConnecter™ – PAC Prototype, for several days after the March 17, 2015 meeting, was confidential, (g) the PatientConnecter™ – PAC Prototype was and is to be maintained in confidence and (h) the PatientConnecter™ – PAC Prototype derived and derives value from its secrecy.

344.    Kindred never has been authorized, and is not authorized, to allow public access to or publicly disclose or use any ChatterPlug Confidential Information, including the PatientConnecter™ -- PAC Trade Secrets.

345.    At all relevant times, Kindred has known, and Kindred currently knows, that it never has been authorized, and is not authorized, to allow public access to or publicly disclose or

use any ChatterPlug Confidential Information, including the PatientConnecter™ -- PAC Trade Secrets.

**Limited Electronic Files And Limited Access To Electronic Files**

346.    When ChatterPlug was involved with the Kindred Project, there was one electronic version of the PatientConnecter™ – PAC Tool Outline to which authorized persons had access and one backup electronic version of the PatientConnecter™ – PAC Tool Outline to which ChatterPlug had access.

347.    When ChatterPlug was involved with the Kindred Project, the electronic version of the PatientConnecter™ – PAC Tool Outline to which authorized persons had access was stored in a DropBox folder that Digital Intent created and, along with ChatterPlug, used for only the Kindred Project.

348.    The authorized persons who had access to the Dropbox folder in which the electronic version of the PatientConnecter™ – PAC Tool Outline was stored had to be invited to access that folder and had to accept the invitation.

349.    When ChatterPlug was involved with the Kindred Project, a limited number of persons, namely, (a) Digital Intent, through (i) employees Katz, Dwyer, Anarde, Johnson, Fassett, Bogert and Drake and (ii) two contractors, and (b) ChatterPlug, through Book, were authorized to access the Dropbox folder in which the electronic version of the PatientConnecter™ – PAC Tool Outline was stored.

350.    When ChatterPlug was involved with the Kindred Project, ChatterPlug, through Book, provided an electronic copy of the PatientConnecter™ – PAC Tool Outline to four then-authorized persons, namely, Digital Intent employees Katz, Fassett and Bogert and a Digital Intent contractor.

351.    Currently, ChatterPlug has two electronic copies, one of which is a backup copy, of the PatientConnecter™ -- PAC Tool Outline.

352.    When ChatterPlug was involved with the Kindred Project, there was one electronic version of the PatientConnecter™ – PAC Tool Spreadsheet to which authorized persons had access and one backup electronic version of the PatientConnecter™ – PAC Tool Spreadsheet to which ChatterPlug had access.

353.    When ChatterPlug was involved with the Kindred Project, the electronic version of the PatientConnecter™ – PAC Tool Spreadsheet to which authorized persons had access was stored in a DropBox folder that Digital Intent created and, along with ChatterPlug, used for only the Kindred Project.

354.    The authorized persons who had access to the Dropbox folder in which the electronic version of the PatientConnecter™ – PAC Tool Spreadsheet was stored had to be invited to access to that folder and had to accept the invitation.

355.    When ChatterPlug was involved with the Kindred Project, a limited number of persons, namely, (a) Digital Intent, through employees Katz, Dwyer, Anarde and Johnson, and (b) ChatterPlug, through Book, were authorized to access the Dropbox folder in which the PatientConnecter™ – PAC Tool Spreadsheet was stored.

356.    When ChatterPlug was involved with the Kindred Project, ChatterPlug, through Book, provided an electronic copy of the PatientConnecter™ – PAC Tool Spreadsheet to two then-authorized persons, namely, Digital Intent employee Fassett and a Digital Intent contractor.

357.    Currently, ChatterPlug has two electronic copies, one of which is a backup copy, of the PatientConnecter™ -- PAC Tool Spreadsheet.

358.    When ChatterPlug was involved with the Kindred Project, there were three

electronic versions of the PatientConnecter™ -- PAC Prototype: (a) one master, electronic version of the PatientConnecter™ -- PAC Prototype, (b) one copy of the master, electronic version of the PatientConnecter™ -- PAC Prototype and (c) one pdf copy of the master, electronic version of the PatientConnecter™ -- PAC Prototype.

359.    The master, electronic version of the PatientConnecter™ -- PAC Prototype was stored in two parts.

360.    Each of the two parts of the master, electronic version of the PatientConnecter™ -- PAC Prototype was a design, *a.k.a.* original, file.

361.    One of the two design files for the master, electronic version of the PatientConnecter™ -- PAC Prototype was stored on a Digital Intent hard drive.

362.    One of the two design files for the master, electronic version of the PatientConnecter™ -- PAC Prototype was stored on a hard drive of a Digital Intent contractor.

363.    In connection with the March 17, 2015 meeting, the copy of the master, electronic version of the PatientConnecter™ -- PAC Prototype was uploaded to a secure, protected platform.

364.    The secure, protected platform enabled a clickable, interactive demonstration of the PatientConnecter™ -- PAC Prototype.

365.    Digital Intent had the account with the platform.

366.    With ChatterPlug's approval, Digital Intent uploaded the copy of the master, electronic version of the PatientConnecter™ -- PAC Prototype to the platform.

367.    Kindred's temporary and confidential access to the PatientConnecter™ -- PAC Prototype for several days after the March 17, 2015 meeting was temporary and confidential access to the uploaded, clickable, interactive copy of the master, electronic version of the PatientConnecter™ -- PAC Prototype.

368.     Several days after the March 17, 2015 meeting, ChatterPlug, through Digital Intent, terminated Kindred's ability to access the uploaded copy of the PatientConnecter™ -- PAC Prototype.

369.     ChatterPlug terminated Kindred's ability to access the uploaded copy of the PatientConnecter™ -- PAC Prototype because the PatientConnecter™ -- PAC Prototype is ChatterPlug Confidential Information and a ChatterPlug trade secret.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

370.     On or around March 24, 2015, ChatterPlug, through Book, created the pdf copy of the master, electronic version of the PatientConnecter™ -- PAC Prototype.

371.     On or around April 3, 2015, Book e-mailed Hixon a copy of the pdf copy that she had created on or around March 24, 2015.

372.     Currently, ChatterPlug has three pdf copies, one of which is a backup copy, of the PatientConnecter™ -- PAC Prototype.

**Limited Paper Copies**

373.     On information and belief, when ChatterPlug was involved with the Kindred Project, a limited number of paper copies of the PatientConnecter™ -- PAC Tool Outline were made.

374.     On information and belief, when ChatterPlug was involved with the Kindred Project, all paper copies of the PatientConnecter™ -- PAC Tool Outline were made for use during internal Kindred Project meetings.

375.     On information and belief, each paper copy of the PatientConnecter™ -- PAC Tool Outline was shredded shortly after the internal Kindred Project meeting for which it was made ended.

376.    Currently, ChatterPlug has one paper copy of a portion of the PatientConnecter™ -- PAC Tool Outline.

377.    Currently, ChatterPlug has no paper copy of the complete PatientConnecter™ -- PAC Tool Outline.

378.    On information and belief, when ChatterPlug was involved with the Kindred Project, there were no paper copies of the PatientConnecter™ -- PAC Tool Spreadsheet.

379.    Currently, ChatterPlug has no paper copy of the PatientConnecter™ -- PAC Tool Spreadsheet.

380.    On information and belief, when ChatterPlug was involved with the Kindred Project, there were no paper copies of the PatientConnecter™ -- PAC Prototype.

381.    Currently, ChatterPlug has no paper copy of the PatientConnecter™ -- PAC Prototype.

382.    Each of the PatientConnecter™ – PAC Trade Secrets has been and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

**FIRST CLAIM FOR RELIEF:**
**TRADE SECRET MISAPPROPRIATION BY**
**DIGITAL INTENT (wrongful use (prototypes)**
**under the ITSA, 765 ILCS § 1065/1, *et seq.*)**

383.    ChatterPlug re-alleges paragraphs 1 through 382 as if fully alleged herein.

384.    Through the MCA, Digital Intent has known or had reason to know that its knowledge of the PatientConnecter™ -- PAC Trade Secrets was acquired under circumstances giving rise to duties to maintain their secrecy and limit access to, disclosure of and use of the PatientConnecter™ -- PAC Trade Secrets.  (Confidential Exhibit A (MCA), p. 1 and §§ 1-3, 5.)

385.    On information and belief, since April 1, 2015, Digital Intent, without express or implied authority or consent, (a) actually has accessed, actually is accessing, actually will access,

(b) has threatened to access, is threatening to access, will threaten to access and (c) inevitably has accessed, inevitably is accessing and inevitably will access one or both of the PatientConnecter™ – PAC Trade Secrets.

386.    Paragraphs 470-507 are alleged as if fully alleged herein.

387.    On information and belief, since April 1, 2015, Digital Intent has breached and is breaching the MCA and, in particular, MCA limitations, prohibitions, duties and obligations involving ChatterPlug Confidential Information, including the PatientConnecter™ -- PAC Trade Secrets.  (Confidential Exhibit A (MCA), p. 1 and §§ 1-3, 5.)

388.    Since April 1, 2015, Digital Intent has known or had reason to know that its post-April 1, 2015 conduct involving either or both of the PatientConnecter™ – PAC Trade Secrets, including its access to, disclosure of and use of either or both of the PatientConnecter™ – PAC Trade Secrets, was from or through improper means, including its breaching of the MCA.

389.    On information and belief, since April 1, 2015, Digital Intent, without express or implied authority or consent, (a) actually has used, actually is using, actually will use, (b) has threatened to use, is threatening to use, will threaten to use and (c) inevitably has used, inevitably is using and inevitably will use one or both of the PatientConnecter™ – PAC Trade Secrets as, as part of, in connection with or to design or develop one or more prototypes or materials for or relating to the Kindred Project or otherwise.

390.    On information and belief, since April 1, 2015, Digital Intent's actual, threatened and inevitable use of one or both of the PatientConnecter™ – PAC Trade Secrets has included, is including and will include reliance on one or both of the PatientConnecter™ – PAC Trade Secrets.

391.    On information and belief, since April 1, 2015, one or more prototypes or materials for or relating to the Kindred Project or otherwise have been, are being or will be copied,

substantially derived or derived by Digital Intent from one or both of the PatientConnecter™ – PAC Trade Secrets.

392.     On or around November 12, 2015, Kindred held its seventh annual Kindred Clinical Impact Symposium (the "Kindred Symposium") in Louisville, Kentucky.

393.     A true and accurate copy of a November 12, 2015 blog post, from Kindred's website, is attached as Exhibit K.

394.     During the Kindred Symposium, Digital Intent and Kindred jointly and publicly disclosed, promoted and marketed "Maxwell, a new patient-experience app that will be available to patients in the near future." (Exhibit K.)

395.     Digital Intent and Kindred's joint and public disclosure, promotion and marketing of Maxwell during the Kindred Symposium included joint and public disclosure, promotion and marketing of "screenshots." (Exhibit K.)

396.     At least one of the screenshots that Digital Intent and Kindred jointly and publicly disclosed, promoted and marketed during the Kindred Symposium also is jointly and publicly disclosed, promoted and marketed on Kindred's website. (Exhibit K.)

397.     At least one of the screenshots that Digital Intent and Kindred jointly and publicly disclosed, promoted and marketed during the Kindred Symposium and are jointly and publicly disclosing, promoting and marketing on Kindred's website was copied, substantially derived or derived from one or both of the PatientConnecter™ -- PAC Trade Secrets by Digital Intent, Kindred or both. (Exhibit K.)

398.     During the Kindred Symposium, Kindred, on behalf of itself and Digital Intent, stated, through Zachariah, that Zachariah "worked with Digital Intent, a Chicago-based company, on the design" of Maxwell. (Exhibit K.)

399.    On Kindred's website, Kindred, on behalf of itself and Digital Intent, has stated and is stating that Zachariah "worked with Digital Intent, a Chicago-based company, on the design" of Maxwell.  (Exhibit K.)

400.    On information and belief, Maxwell is a result of Digital Intent and Kindred's actual use of, including reliance on, one or both of the PatientConnecter™ - PAC Trade Secrets.

401.    On information and belief, Maxwell is a copy of, embodies or is substantially derived from one or both of the PatientConnecter™ - PAC Trade Secrets.

402.    On information and belief, Maxwell is related material, as set forth in the MCA. (Confidential Exhibit A (MCA), §§ 1 and 3.)

403.    Since April 1, 2015, Digital Intent's actual access to one or both of the PatientConnecter™ – PAC Trade Secrets constitutes trade secret misappropriation.

404.    Since April 1, 2015, Digital Intent's threatened access to one or both of the PatientConnecter™ – PAC Trade Secrets constitutes trade secret misappropriation.

405.    Since April 1, 2015, Digital Intent's inevitable access to one or both of the PatientConnecter™ – PAC Trade Secrets constitutes trade secret misappropriation.

406.    Since April 1, 2015, Digital Intent's actual use of one or both of the PatientConnecter™ – PAC Trade Secrets constitutes trade secret misappropriation.

407.    Since April 1, 2015, Digital Intent's threatened use of one or both of the PatientConnecter™ – PAC Trade Secrets constitutes trade secret misappropriation.

408.    Since April 1, 2015, Digital Intent's inevitable use of one or both of the PatientConnecter™ – PAC Trade Secrets constitutes trade secret misappropriation.

409.    ChatterPlug has sustained, is sustaining and will sustain actual losses as a result of Digital Intent's actual, threatened and inevitable misappropriation, through access, use or both, of

one or both of the PatientConnecter™ – PAC Trade Secrets.

410.    ChatterPlug has sustained and is sustaining irreparable harm, for which there is no adequate remedy at law, as a result of Digital Intent's actual, threatened and inevitable misappropriation, through access, use or both, of one or both of the PatientConnecter™ – PAC Trade Secrets and will sustain additional irreparable harm, for which there is no adequate remedy at law, unless Digital Intent is enjoined from actual, threatened and inevitable misappropriation, through access or use, of one or both of the PatientConnecter™ – PAC Trade Secrets.

411.    The irreparable harm that ChatterPlug has sustained, is sustaining and will sustain as a result of Digital Intent's actual, threatened and inevitable misappropriation, through access, use or both, of one or both of the PatientConnecter™ – PAC Trade Secrets includes harm to, or deprivation of one or more opportunities to establish or enhance, ChatterPlug's goodwill, reputation and appeal, with or among one or more actual or prospective investors, partners or clients, as a pioneering start-up company with an innovative, digital, post-acute care, patient engagement and experience tool, prototype or both and corresponding intellectual property, including trade secret, protection.

412.    Digital Intent has been, is being and will be unjustly enriched as a result of its actual, threatened and inevitable misappropriation, through access, use or both, of one or both of the PatientConnecter™ -- PAC Trade Secrets.

413.    Digital Intent's acts or failures to act that constitute or that have facilitated its or another's actual, threatened or inevitable misappropriation, through access, use or both, of one or both of the PatientConnecter™ – PAC Trade Secrets have been and are willful, malicious, with complete disregard for ChatterPlug's rights and interests and with intent to substantially, actually and irreparably injure ChatterPlug and its rights and interests.

**SECOND CLAIM FOR RELIEF:**
**TRADE SECRET MISAPPROPRIATION BY**
**KINDRED (wrongful use (prototypes) under the**
**ITSA, 765 ILCS § 1065/1, *et seq.*)**

414.     ChatterPlug re-alleges paragraphs 1 through 413 as if fully alleged herein.

415.     On information and belief, Kindred has known or had reason to know that its knowledge of the PatientConnecter™ -- PAC Trade Secrets was acquired under circumstances giving rise to duties to maintain their secrecy and limit access to, disclosure of and use of the PatientConnecter™ -- PAC Trade Secrets.

416.     On information and belief, Kindred has known or had reason to know that its knowledge of the PatientConnecter™ -- PAC Trade Secrets was derived from or through Digital Intent and that Digital Intent owed and owes duties to ChatterPlug to maintain the secrecy of and limit the access to, disclosure of and use of the PatientConnecter™ -- PAC Trade Secrets.

417.     On information and belief, since April 1, 2015, Kindred, without express or implied authority or consent, (a) actually has accessed, actually is accessing, actually will access, (b) has threatened to access, is threatening to access, will threaten to access and (c) inevitably has accessed, inevitably is accessing and inevitably will access one or both of the PatientConnecter™ – PAC Trade Secrets.

418.     On information and belief, since April 1, 2015, Kindred has known or had reason to know that its post-April 1, 2015 access to and knowledge of any of the PatientConnecter™ – PAC Trade Secrets was from or through or derived from or through improper means, including Digital Intent's breaching of the MCA and Kindred's inducing Digital Intent's breaching of the MCA.  (Confidential Exhibit A (MCA), p. 1 and §§ 1-3, 5.)

419.     On information and belief, since April 1, 2015, Kindred, without express or implied authority or consent, (a) actually has used, actually is using, actually will use, (b) has threatened

to use, is threatening to use, will threaten to use and (c) inevitably has used, inevitably is using and inevitably will use one or both of the PatientConnecter™ – PAC Trade Secrets as, as part of, in connection with or to design or develop one or more prototypes or materials for or relating to the Kindred Project or otherwise.

420.    On information and belief, since April 1, 2015, Kindred's actual, threatened and inevitable use of one or both of the PatientConnecter™ – PAC Trade Secrets has included, is including and will include reliance on one or both of the PatientConnecter™ – PAC Trade Secrets.

421.    On information and belief, since April 1, 2015, one or more prototypes or materials for or relating to the Kindred Project or otherwise have been, are being or will be copied, substantially derived or derived by Kindred from one or both of the PatientConnecter™ – PAC Trade Secrets.

422.    Since April 1, 2015, Kindred's actual access to one or both of the PatientConnecter™ – PAC Trade Secrets constitutes trade secret misappropriation.

423.    Since April 1, 2015, Kindred's threatened access to one or both of the PatientConnecter™ – PAC Trade Secrets constitutes trade secret misappropriation.

424.    Since April 1, 2015, Kindred's inevitable access to one or both of the PatientConnecter™ – PAC Trade Secrets constitutes trade secret misappropriation.

425.    Since April 1, 2015, Kindred's actual use of one or both of the PatientConnecter™ – PAC Trade Secrets constitutes trade secret misappropriation.

426.    Since April 1, 2015, Kindred's threatened use of one or both of the PatientConnecter™ – PAC Trade Secrets constitutes trade secret misappropriation.

427.    Since April 1, 2015, Kindred's inevitable use of one or both of the PatientConnecter™ – PAC Trade Secrets constitutes trade secret misappropriation.

428.    ChatterPlug has sustained, is sustaining and will sustain actual losses as a result of Kindred's actual, threatened and inevitable misappropriation, through access, use or both, of one or both of the PatientConnecter™ – PAC Trade Secrets.

429.    ChatterPlug has sustained and is sustaining irreparable harm, for which there is no adequate remedy at law, as a result of Kindred's actual, threatened and inevitable misappropriation, through access, use or both, of one or both of the PatientConnecter™ – PAC Trade Secrets and will sustain additional irreparable harm, for which there is no adequate remedy at law, unless Kindred is enjoined from actual, threatened and inevitable misappropriation, through access or use, of one or both of the PatientConnecter™ – PAC Trade Secrets.

430.    The irreparable harm that ChatterPlug has sustained, is sustaining and will sustain as a result of Kindred's actual, threatened and inevitable misappropriation, through access, use or both, of one or both of the PatientConnecter™ – PAC Trade Secrets includes harm to, or deprivation of one or more opportunities to establish or enhance, ChatterPlug's goodwill, reputation and appeal, with or among one or more actual or prospective investors, partners or clients, as a pioneering start-up company with an innovative, digital, post-acute care, patient engagement and experience tool, prototype or both and corresponding intellectual property, including trade secret, protection.

431.    Kindred has been, is being and will be unjustly enriched as a result of its actual, threatened and inevitable misappropriation, through access, use or both, of one or both of the PatientConnecter™ -- PAC Trade Secrets.

432.    Kindred's acts or failures to act that constitute or that have facilitated its or another's actual, threatened or inevitable misappropriation, through access, use or both, of one or both of the PatientConnecter™ – PAC Trade Secrets have been and are willful, malicious, with

complete disregard for ChatterPlug's rights and interests and with intent to substantially, actually and irreparably injure ChatterPlug and its rights and interests.

### THIRD CLAIM FOR RELIEF:
### TRADE SECRET MISAPPROPRIATION BY
### DIGITAL INTENT (wrongful use (products)
### under the ITSA, 765 ILCS § 1065/1, *et seq.*)

433.  ChatterPlug re-alleges paragraphs 1 through 432 as if fully alleged herein.

434.  On information and belief, since April 1, 2015, Digital Intent, without express or implied authority or consent, (a) actually has used, actually is using, actually will use, (b) has threatened to use, is threatening to use, will threaten to use and (c) inevitably has used, inevitably is using and inevitably will use one or both of the PatientConnecter™ – PAC Trade Secrets as, as part of, in connection with or to design or develop one or more tools, products, applications, *a.k.a.* apps, or materials for or relating to the Kindred Project or otherwise.

435.  On information and belief, since April 1, 2015, one or more tools, products, applications, *a.k.a.* apps, or materials for or relating to the Kindred Project or otherwise have been, are being or will be copied, substantially derived or derived by Digital Intent from one or both of the PatientConnecter™ – PAC Trade Secrets.

### FOURTH CLAIM FOR RELIEF:
### TRADE SECRET MISAPPROPRIATION BY
### KINDRED (wrongful use (products) under the
### ITSA, 765 ILCS § 1065/1, *et seq.*)

436.  ChatterPlug re-alleges paragraphs 1 through 435 as if fully alleged herein.

437.  On information and belief, since April 1, 2015, Kindred, without express or implied authority or consent, (a) actually has used, actually is using, actually will use, (b) has threatened to use, is threatening to use, will threaten to use and (c) inevitably has used, inevitably is using and inevitably will use one or both of the PatientConnecter™ – PAC Trade Secrets as, as part of, in

connection with or to design or develop one or more tools, products, applications, *a.k.a.* apps, or materials for or relating to the Kindred Project or otherwise.

438. On information and belief, since April 1, 2015, one or more tools, products, applications, *a.k.a.* apps, or materials for or relating to the Kindred Project or otherwise have been, are being or will be copied, substantially derived or derived by Kindred from one or both of the PatientConnecter™ – PAC Trade Secrets.

**FIFTH CLAIM FOR RELIEF:**
**TRADE SECRET MISAPPROPRIATION BY**
**DIGITAL INTENT (wrongful use (self-promotion)**
**<u>under the ITSA, 765 ILCS § 1065/1, *et seq.*)</u>**

439. ChatterPlug re-alleges paragraphs 1 through 438 as if fully alleged herein.

440. On information and belief, since April 1, 2015, Digital Intent, without express or implied authority or consent, (a) actually has used, actually is using, actually will use, (b) has threatened to use, is threatening to use, will threaten to use and (c) inevitably has used, inevitably is using and inevitably will use one or both of the PatientConnecter™ – PAC Trade Secrets to dishonestly and deceptively enhance its deficient technology, leadership, knowledge, experience, acumen, skills and intellectual property rights and, in the process, dishonestly and deceptively promote itself to Kindred or otherwise.

441. Digital Intent has been able to solidify and expand its commercial relationship with Kindred, including continuation and expansion of the Kindred Project, because of its misappropriation, through use, of one or both of the PatientConnecter™ – PAC Trade Secrets and its corresponding dishonesty and deception.

**SIXTH CLAIM FOR RELIEF:**
**TRADE SECRET MISAPPROPRIATION BY**
**DIGITAL INTENT (wrongful disclosure**
**(prototypes) under the ITSA, 765 ILCS § 1065/1, *et***
***seq.*)**

442.     ChatterPlug re-alleges paragraphs 1 through 441 as if fully alleged herein.

443.     On information and belief, since April 1, 2015, Digital Intent, without express or implied authority or consent, (a) actually has disclosed, actually is disclosing, actually will disclose, (b) has threatened to disclose, is threatening to disclose, will threaten to disclose and (c) inevitably has disclosed, inevitably is disclosing and inevitably will disclose one or both of the PatientConnecter™ – PAC Trade Secrets as, as part of, in connection with or to design or develop one or more prototypes or materials for or relating to the Kindred Project or otherwise, to one or more unauthorized persons, including (i) Kindred, (ii) one or more other companies and (iii) one or more individuals.

444.     Since April 1, 2015, Digital Intent's actual disclosure of one or both of the PatientConnecter™ – PAC Trade Secrets constitutes trade secret misappropriation.

445.     Since April 1, 2015, Digital Intent's threatened disclosure of one or both of the PatientConnecter™ – PAC Trade Secrets constitutes trade secret misappropriation.

446.     Since April 1, 2015, Digital Intent's inevitable disclosure of one or both of the PatientConnecter™ – PAC Trade Secrets constitutes trade secret misappropriation.

447.     ChatterPlug has sustained, is sustaining and will sustain actual losses as a result of Digital Intent's actual, threatened and inevitable misappropriation, through disclosure, of one or both of the PatientConnecter™ – PAC Trade Secrets.

448.     ChatterPlug has sustained and is sustaining irreparable harm, for which there is no adequate remedy at law, as a result of Digital Intent's actual, threatened and inevitable

misappropriation, through disclosure, of one or both of the PatientConnecter™ – PAC Trade Secrets and will sustain additional irreparable harm, for which there is no adequate remedy at law, unless Digital Intent is enjoined from actual, threatened and inevitable misappropriation, through disclosure, of one or both of the PatientConnecter™ – PAC Trade Secrets.

449.    The irreparable harm that ChatterPlug has sustained, is sustaining and will sustain as a result of Digital Intent's actual, threatened and inevitable misappropriation, through disclosure, of one or both of the PatientConnecter™ – PAC Trade Secrets includes harm to, or deprivation of one or more opportunities to establish or enhance, ChatterPlug's goodwill, reputation and appeal, with or among one or more actual or prospective investors, partners or clients, as a pioneering start-up company with an innovative, digital, post-acute care, patient engagement and experience tool, prototype or both and corresponding intellectual property, including trade secret, protection.

450.    Digital Intent has been, is being and will be unjustly enriched as a result of its actual, threatened and inevitable misappropriation, through disclosure, of one or both of the PatientConnecter™ -- PAC Trade Secrets.

451.    Digital Intent's acts or failures to act that constitute or that have facilitated its or another's actual, threatened or inevitable misappropriation, through disclosure, of one or both of the PatientConnecter™ – PAC Trade Secrets have been and are willful, malicious, with complete disregard for ChatterPlug's rights and interests and with intent to substantially, actually and irreparably injure ChatterPlug and its rights and interests.

**SEVENTH CLAIM FOR RELIEF:**
**TRADE SECRET MISAPPROPRIATION BY**
**KINDRED (wrongful disclosure (prototypes)**
**under the ITSA, 765 ILCS § 1065/1, *et seq.*)**

452.    ChatterPlug re-alleges paragraphs 1 through 451 as if fully alleged herein.

453. On information and belief, since April 1, 2015, Kindred, without express or implied authority or consent, (a) actually has disclosed, actually is disclosing, actually will disclose, (b) has threatened to disclose, is threatening to disclose, will threaten to disclose and (c) inevitably has disclosed, inevitably is disclosing and inevitably will disclose one or both of the PatientConnecter™ – PAC Trade Secrets, as, as part of, in connection with or to design or develop one or more prototypes or materials for or relating to the Kindred Project or otherwise, to one or more unauthorized persons, including (i) Digital Intent, (ii) one or more other companies and (iii) one or more individuals.

454. Since April 1, 2015, Kindred's actual disclosure of one or both of the PatientConnecter™ – PAC Trade Secrets constitutes trade secret misappropriation.

455. Since April 1, 2015, Kindred's threatened disclosure of one or both of the PatientConnecter™ – PAC Trade Secrets constitutes trade secret misappropriation.

456. Since April 1, 2015, Kindred's inevitable disclosure of one or both of the PatientConnecter™ – PAC Trade Secrets constitutes trade secret misappropriation.

457. ChatterPlug has sustained, is sustaining and will sustain actual losses as a result of Kindred's actual, threatened and inevitable misappropriation, through disclosure, of one or both of the PatientConnecter™ – PAC Trade Secrets.

458. ChatterPlug has sustained and is sustaining irreparable harm, for which there is no adequate remedy at law, as a result of Kindred's actual, threatened and inevitable misappropriation, through disclosure, of one or both of the PatientConnecter™ – PAC Trade Secrets and will sustain additional irreparable harm, for which there is no adequate remedy at law, unless Kindred is enjoined from actual, threatened and inevitable misappropriation, through disclosure, of one or both of the PatientConnecter™ – PAC Trade Secrets.

459.     The irreparable harm that ChatterPlug has sustained, is sustaining and will sustain as a result of Kindred's actual, threatened and inevitable misappropriation, through disclosure, of one or both of the PatientConnecter™ – PAC Trade Secrets includes harm to, or deprivation of one or more opportunities to establish or enhance, ChatterPlug's goodwill, reputation and appeal, with or among one or more actual or prospective investors, partners or clients, as a pioneering start-up company with an innovative, digital, post-acute care, patient engagement and experience tool, prototype or both and corresponding intellectual property, including trade secret, protection.

460.     Kindred has been, is being and will be unjustly enriched as a result of its actual, threatened and inevitable misappropriation, through disclosure, of one or both of the PatientConnecter™ -- PAC Trade Secrets.

461.     Kindred's acts or failures to act that constitute or that have facilitated its or another's actual, threatened or inevitable misappropriation, through disclosure, of one or both of the PatientConnecter™ – PAC Trade Secrets have been and are willful, malicious, with complete disregard for ChatterPlug's rights and interests and with intent to substantially, actually and irreparably injure ChatterPlug and its rights and interests.

**EIGHTH CLAIM FOR RELIEF:**
**TRADE SECRET MISAPPROPRIATION BY**
**DIGITAL INTENT (wrongful disclosure**
**(products) under the ITSA, 765 ILCS § 1065/1, *et***
***seq.*)**

462.     ChatterPlug re-alleges paragraphs 1 through 461 as if fully alleged herein.

463.     On information and belief, since April 1, 2015, Digital Intent, without express or implied authority or consent, (a) actually has disclosed, actually is disclosing, actually will disclose, (b) has threatened to disclose, is threatening to disclose, will threaten to disclose and (c) inevitably has disclosed, inevitably is disclosing and inevitably will disclose one or both of the

67

PatientConnecter™ – PAC Trade Secrets, as, as part of, in connection with or to design or develop one or more tools, products, applications, *a.k.a.* apps, or materials for or relating to the Kindred Project or otherwise, to one or more unauthorized persons, including (i) Kindred, (ii) one or more other companies and (iii) one or more individuals.

**NINTH CLAIM FOR RELIEF:**
**TRADE SECRET MISAPPROPRIATION BY**
**KINDRED (wrongful disclosure (products) under**
**the ITSA, 765 ILCS § 1065/1, *et seq.*)**

464.     ChatterPlug re-alleges paragraphs 1 through 463 as if fully alleged herein.

465.     On information and belief, since April 1, 2015, Kindred, without express or implied authority or consent, (a) actually has disclosed, actually is disclosing, actually will disclose, (b) has threatened to disclose, is threatening to disclose, will threaten to disclose and (c) inevitably has disclosed, inevitably is disclosing and inevitably will disclose one or both of the PatientConnecter™ – PAC Trade Secrets, as, as part of, in connection with or to design or develop one or more tools, products, applications, *a.k.a.* apps, or materials for or relating to the Kindred Project or otherwise, to one or more unauthorized persons, including (i) Digital Intent, (ii) one or more other companies and (iii) one or more individuals.

**TENTH CLAIM FOR RELIEF:**
**TRADE SECRET MISAPPROPRIATION BY**
**DIGITAL INTENT (wrongful disclosure (self-**
**promotion) under the ITSA, 765 ILCS § 1065/1, *et***
**seq.)**

466.     ChatterPlug re-alleges paragraphs 1 through 465 as if fully alleged herein.

467.     On information and belief, since April 1, 2015, Digital Intent, without express or implied authority or consent, (a) actually has disclosed, actually is disclosing, actually will disclose, (b) has threatened to disclose, is threatening to disclose, will threaten to disclose and (c) inevitably has disclosed, inevitably is disclosing and inevitably will disclose one or both of the

PatientConnecter™ -- PAC Trade Secrets to one or more unauthorized persons, including (i) Kindred, (ii) one or more other companies and (iii) one or more individuals, to dishonestly and deceptively enhance Digital Intent's deficient technology, leadership, knowledge, experience, acumen, skills and intellectual property rights and, in the process, dishonestly and deceptively promote itself to Kindred or otherwise.

468.    Digital Intent has been able to solidify and expand its commercial relationship with Kindred, including continuation and expansion of the Kindred Project, because of its misappropriation, through disclosure, of one or both of the PatientConnecter™ -- PAC Trade Secrets and its corresponding dishonesty and deception.

### ELEVENTH CLAIM FOR RELIEF:
### BREACH OF CONTRACT BY
### DIGITAL INTENT (wrongful
### use; under Delaware law)

469.    ChatterPlug re-alleges paragraphs 1 through 468 as if fully alleged herein.

470.    The MCA is a valid, binding and enforceable contract between ChatterPlug and Digital Intent.

471.    ChatterPlug has performed and complied with and is performing and complying with all of its duties, obligations, limitations and prohibitions under the MCA.

472.    On information and belief, on one or more occasions, Digital Intent has breached, is breaching and, unless Digital Intent is ordered to specifically perform and comply with its duties, obligations, limitations and prohibitions under the MCA, will continue to breach the MCA by wrongfully using one or both of the PatientConnecter™ – PAC Trade Secrets.  (Confidential Exhibit A (MCA), p. 1 & § 2, 1st sentence.)

473.    Digital Intent's one or more past, present and future breaches of the MCA have been, are and will be willful, malicious, in bad faith, outrageous and with intent to substantially,

actually and irreparably injure ChatterPlug and its rights and interests.

474.    Digital Intent's one or more past, present and future breaches of the MCA have been committed, are being committed and will be committed with no less than reckless indifference to ChatterPlug's rights and interests.

475.    As a direct and proximate result of Digital Intent's one or more past, present and future breaches of the MCA, ChatterPlug has been, is being and will be damaged.

476.    The damages that ChatterPlug has sustained, is sustaining and will sustain as a direct and proximate result of Digital Intent's one or more past, present and future breaches of the MCA include ChatterPlug's lost profits from, among other things, one or more written subscription or license agreements that were not entered into.

**TWELFTH CLAIM FOR RELIEF:**
**TORTIOUS INTERFERENCE**
**WITH CONTRACT BY**
**<u>KINDRED (under Illinois law)</u>**

477.    ChatterPlug re-alleges paragraphs 1 through 476 as if fully alleged herein.

478.    On information and belief, on one or more occasions, Kindred intentionally and unjustifiably has induced, is inducing and, unless enjoined, will continue to induce Digital Intent's one or more past, present and future breaches of the MCA and, in particular, Digital Intent's wrongful use of one or both of the PatientConnecter™ – PAC Trade Secrets. (Confidential Exhibit A (MCA), p. 1 and § 2, 1st sentence.)

479.    On information and belief, Kindred's one or more intentional and unjustifiable inducing acts have included, include and, unless Kindred is enjoined, will continue to include Kindred (a) expressing its willingness to work with Digital Intent and (b) working with Digital Intent only if Digital Intent ignores or disregards its duties, obligations, limitations and prohibitions under the MCA and, as such, breaches the MCA.

480.    On information and belief, Kindred's one or more intentional and unjustifiable inducing acts have caused, are causing and, unless Kindred is enjoined, will continue to cause Digital Intent's one or more past, present and future breaches of the MCA.

481.    On information and belief, Kindred has engaged, in engaging and, unless Kindred is enjoined, will continue to engage in one or more intentional and unjustifiable inducing acts at least because (a) at all relevant times, Kindred has known and currently knows that one or both of the PatientConnecter™ -- PAC Trade Secrets are components that are critical to commercializing an innovative, digital, post-acute care, patient engagement and experience tool, (b) at all relevant times, Kindred has known that one or both of those two critical components would enable, and currently knows that one or both of those two critical components have enabled, a more timely or quicker announcement, introduction, launch or offering of an innovative, digital, post-acute care, patient engagement and experience tool, (c) at all relevant times, Kindred and Digital Intent have known of and currently know of, but have not wanted to and do not want to acknowledge, ChatterPlug's ownership of all rights, title and interests in and to, among other things, the PatientConnecter™ -- PAC Trade Secrets, (d) Kindred and Digital Intent have not wanted to and do not want to compensate ChatterPlug for authorization to, among other things, commercially use, among other things, the PatientConnecter™ – PAC Trade Secrets, and (e) Kindred and Digital Intent have believed that ChatterPlug would not challenge Kindred's deceptive, dishonest and unlawful conduct and Digital Intent's deceptive, dishonest and unlawful conduct.

482.    On information and belief, Kindred's one or more past, present and future intentional and unjustifiable inducing acts have been, are and will be malicious, in bad faith, outrageous and with intent to substantially, actually and irreparably injure ChatterPlug and its rights and interests.

483. On information and belief, Kindred's one or more past, present and future intentional and unjustifiable inducing acts have been committed, are being committed and will be committed with no less than reckless indifference to ChatterPlug's rights and interests.

484. On information and belief, as a direct and proximate result of Kindred's one or more past, present and future intentional and unjustifiable inducing acts and Digital Intent's one or more past, present and future breaches of the MCA, ChatterPlug has been, is being and will be damaged.

485. On information and belief, the damages that ChatterPlug has sustained, is sustaining and will sustain as a direct and proximate result of Kindred's one or more past, present and future intentional and unjustifiable inducing acts and Digital Intent's one or more past, present and future breaches of the MCA include ChatterPlug's lost profits from, among other things, one or more written subscription or license agreements that were not entered into.

### THIRTEENTH CLAIM FOR RELIEF:
### BREACH OF CONTRACT BY
### DIGITAL INTENT (wrongful
### disclosure; under Delaware law)

486. ChatterPlug re-alleges paragraphs 1 through 485 as if fully alleged herein.

487. On information and belief, on one or more occasions, Digital Intent has breached, is breaching and, unless Digital Intent is ordered to specifically perform and comply with its duties, obligations, limitations and prohibitions under the MCA, will continue to breach the MCA by wrongfully disclosing one or both of the PatientConnecter™ – PAC Trade Secrets. (Confidential Exhibit A (MCA), p. 1 and § 2, 1st sentence.)

## FOURTEENTH CLAIM FOR RELIEF:
## TORTIOUS INTERFERENCE
## WITH CONTRACT BY
## KINDRED (under Illinois law)

488.    ChatterPlug re-alleges paragraphs 1 through 487 as if fully alleged herein.

489.    On information and belief, on one or more occasions, Kindred intentionally and unjustifiably has induced, is inducing and, unless enjoined, will continue to induce Digital Intent's one or more past, present and future breaches of the MCA and, in particular, Digital Intent's wrongful disclosure of one or both of the PatientConnecter™ – PAC Trade Secrets.  (Confidential Exhibit A (MCA), p. 1 and § 2, 1st sentence.)

## FIFTEENTH CLAIM FOR RELIEF:
## BREACH OF CONTRACT BY
## DIGITAL INTENT (wrongful
## disclosure; under Delaware law)

490.    ChatterPlug re-alleges paragraphs 1 through 489 as if fully alleged herein.

491.    On information and belief, on one or more occasions, Digital Intent has breached, is breaching and, unless Digital Intent is ordered to specifically perform and comply with its duties, obligations, limitations and prohibitions under the MCA, will continue to breach the MCA by wrongfully disclosing one or both of the PatientConnecter™ – PAC Trade Secrets.  (Confidential Exhibit A (MCA), p. 1 and § 2, 3rd sentence.)

## SIXTEENTH CLAIM FOR RELIEF:
## TORTIOUS INTERFERENCE
## WITH CONTRACT BY
## KINDRED (under Illinois law)

492.    ChatterPlug re-alleges paragraphs 1 through 491 as if fully alleged herein.

493.    On information and belief, on one or more occasions, Kindred intentionally and unjustifiably has induced, is inducing and, unless enjoined, will continue to induce Digital Intent's one or more past, present and future breaches of the MCA and, in particular, Digital Intent's

wrongful disclosure of one or both of the PatientConnecter™ – PAC Trade Secrets. (Confidential Exhibit A (MCA), p. 1 and § 2, 3rd sentence.)

## SEVENTEENTH CLAIM FOR RELIEF:
## BREACH OF CONTRACT BY
## DIGITAL INTENT (wrongfully
## providing access; under Delaware
## law)

494. ChatterPlug re-alleges paragraphs 1 through 493 as if fully alleged herein.

495. On information and belief, on one or more occasions, Digital Intent has breached, is breaching and, unless Digital Intent is ordered to specifically perform and comply with its duties, obligations, limitations and prohibitions under the MCA, will continue to breach the MCA by wrongfully providing access to one or both of the PatientConnecter™ – PAC Trade Secrets. (Confidential Exhibit A (MCA), p. 1 and § 2, 3rd sentence.)

## EIGHTEENTH CLAIM FOR RELIEF:
## TORTIOUS INTERFERENCE
## WITH CONTRACT BY
## KINDRED (under Illinois law)

496. ChatterPlug re-alleges paragraphs 1 through 495 as if fully alleged herein.

497. On information and belief, on one or more occasions, Kindred intentionally and unjustifiably has induced, is inducing and, unless enjoined, will continue to induce Digital Intent's one or more past, present and future breaches of the MCA and, in particular, Digital Intent's wrongfully providing access to one or both of the PatientConnecter™ – PAC Trade Secrets. (Confidential Exhibit A (MCA), p. 1 and § 2, 3rd sentence.)

## NINETEENTH CLAIM FOR RELIEF:
## BREACH OF CONTRACT BY
## DIGITAL INTENT (failure to
## protect; under Delaware law)

498. ChatterPlug re-alleges paragraphs 1 through 497 as if fully alleged herein.

499.     On information and belief, on one or more occasions, Digital Intent has breached, is breaching and, unless Digital Intent is ordered to specifically perform and comply with its duties, obligations, limitations and prohibitions under the MCA, will continue to breach the MCA by wrongfully failing to protect one or both of the PatientConnecter™ – PAC Trade Secrets. (Confidential Exhibit A (MCA), p. 1 and § 2, 4th sentence.)

**TWENTIETH CLAIM FOR RELIEF:**
**TORTIOUS INTERFERENCE**
**WITH CONTRACT BY**
**<u>KINDRED (under Illinois law)</u>**

500.     ChatterPlug re-alleges paragraphs 1 through 499 as if fully alleged herein.

501.     On information and belief, on one or more occasions, Kindred intentionally and unjustifiably has induced, is inducing and, unless enjoined, will continue to induce Digital Intent's one or more past, present and future breaches of the MCA and, in particular, Digital Intent's wrongful failure to protect one or both of the PatientConnecter™ – PAC Trade Secrets. (Confidential Exhibit A (MCA), p. 1 and § 2, 4th sentence.)

**TWENTY-FIRST CLAIM FOR RELIEF:**
**BREACH OF CONTRACT BY**
**DIGITAL INTENT (failure to**
**notify and assist; under Delaware**
**<u>law)</u>**

502.     ChatterPlug re-alleges paragraphs 1 through 501 as if fully alleged herein.

503.     On information and belief, since April 1, 2015, Digital Intent has been and currently is aware of at least its actual, threatened and inevitable misappropriation, through access, use and disclosure, and Kindred's actual, threatened and inevitable misappropriation, through access, use and disclosure, of one or both of the PatientConnecter™ – PAC Trade Secrets.

504.     On information and belief, on one or more occasions, Digital Intent has breached, is breaching and, unless Digital Intent is ordered to specifically perform and comply with its duties,

obligations, limitations and prohibitions under the MCA, will continue to breach the MCA by wrongfully failing to fulfill its notification and assistance duties and obligations. (Confidential Exhibit A (MCA), p. 1 and § 2, 6th sentence.)

**TWENTY-SECOND CLAIM FOR RELIEF:**
**TORTIOUS INTERFERENCE**
**WITH CONTRACT BY**
**KINDRED (under Illinois law)**

505. ChatterPlug re-alleges paragraphs 1 through 504 as if fully alleged herein.

506. On information and belief, on one or more occasions, Kindred intentionally and unjustifiably has induced, is inducing and, unless enjoined, will continue to induce Digital Intent's one or more past, present and future breaches of the MCA and, in particular, Digital Intent's wrongful failure to fulfill its notification and assistance duties and obligations. (Confidential Exhibit A (MCA), p. 1 and § 2, 6th sentence.)

**TWENTY-THIRD CLAIM FOR RELIEF:**
**BREACH OF ORAL**
**CONTRACT BY DIGITAL**
**INTENT (under Illinois law)**

507. ChatterPlug re-alleges paragraphs 1 through 506 as if fully alleged herein.

508. ChatterPlug and Digital Intent entered into a valid and enforceable oral contract as of December 15, 2014 (the "Oral Contract").

509. Pursuant to the Oral Contract, ChatterPlug, through Book, provided management and consulting services to Digital Intent in connection with the Kindred Project.

510. Pursuant to the Oral Contract, Digital Intent was to pay ChatterPlug (a) a bi-monthly fixed fee for management and consulting services that ChatterPlug provided in connection with the Kindred Project and (b) reimbursement for any out-of-pocket expenses that ChatterPlug incurred in connection with the Kindred Project.

511.   Pursuant to the Oral Contract, approximately every two weeks during the period December 15, 2014 through April 1, 2015, ChatterPlug submitted to Digital Intent an invoice for the management and consulting services that ChatterPlug had provided in the preceding two weeks.

512.   On April 9, 2015, ChatterPlug submitted its last invoice to Digital Intent.

513.   ChatterPlug has performed and complied with all of its duties and obligations under the Oral Contract.

514.   Digital Intent has breached and is breaching the Oral Contract by failing to pay ChatterPlug for certain management and consulting services that ChatterPlug provided and failing to reimburse ChatterPlug for certain out-of-pocket expenses that ChatterPlug incurred in connection with the Kindred Project.

515.   On information and belief, Digital Intent and Kindred believed that not paying ChatterPlug for those services and not reimbursing ChatterPlug for those expenses would provide Digital Intent and Kindred with favorable leverage to reach an out-of-court resolution to the present dispute.

516.   Digital Intent's breach of the Oral Contract has been and is willful, malicious, in bad faith, outrageous and with intent to substantially, actually and irreparably injure ChatterPlug and its rights and interests.

517.   Digital Intent's breach of the Oral Contract has been committed and is being committed with no less than reckless indifference to ChatterPlug's rights and interests.

518.   As a direct and proximate result of Digital Intent's breach of the Oral Contract, ChatterPlug has been, is being and, unless Digital Intent performs under and complies with the Oral Contract, will be damaged.

519.    The damages that ChatterPlug has sustained, is sustaining and will sustain as a direct and proximate result of Digital Intent's breach of the Oral Contract are at least $13,627.61, which amount includes unpaid fees for management and consulting services that ChatterPlug provided and un-reimbursed, out-of-pocket expenses that ChatterPlug incurred in connection with the Kindred Project.

**TWENTY-FOURTH CLAIM FOR RELIEF:**
**ORDER FOR SPECIFIC PERFORMANCE OF**
**CONTRACT BY DIGITAL INTENT (under**
**<u>Delaware law)</u>**

520.    ChatterPlug re-alleges paragraphs 1 through 519 as if fully alleged herein.

521.    The MCA is a specifically enforceable contract between ChatterPlug and Digital Intent.  (Confidential Exhibit A (MCA), § 6.5.)

522.    ChatterPlug has been and is ready, willing and able to perform and comply with all of its duties, obligations, limitations and prohibitions under the MCA.

523.    On information and belief, Digital Intent has not performed under or complied with, is not performing under or complying with and, unless an order for specific performance and compliance is entered against Digital Intent, will not perform under or comply with the MCA, including the 1st, 3rd, 4th and 6th sentences of section 2 of the MCA.  (Confidential Exhibit A (MCA), p. 1 and § 2, 1st, 3rd, 4th and 6th sentences.)

524.    Digital Intent's non-performance under and non-compliance with the MCA and Digital Intent's failure to comply with at least ChatterPlug's April 3, 2015 reminder render futile any additional reminder or request by ChatterPlug that Digital Intent perform under and comply with the MCA.

525.    Equitable considerations, including fairness and justice, support an order requiring Digital Intent to specifically perform under and comply with the MCA.

526.     Each of Digital Intent's past, present and future breaches of the MCA, including its multiple failures to perform under and comply with the 1st, 3rd, 4th and 6th sentences of section 2 of the MCA, have caused, are causing and, unless an order for specific performance and compliance is entered against Digital Intent, will cause ChatterPlug irreparable harm for which there is no adequate remedy at law.  (Confidential Exhibit A (MCA), p. 1, § 2, 1st, 3rd, 4th and 6th sentences and § 6.5.)

527.     The balance of the equities favors an order requiring Digital Intent to specifically perform under and comply with the MCA.

**TWENTY-FIFTH CLAIM FOR RELIEF:**
**UNFAIR COMPETITION BY DIGITAL INTENT**
**(false designation of origin, based on reverse palming off, under 15 U.S.C.**
**§ 1125(a))**

528.     ChatterPlug re-alleges paragraphs 1 through 527 as if fully alleged herein.

529.     ChatterPlug is the origin of the PatientConnecter™ -- PAC Prototype.

530.     ChatterPlug is the origin of any tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of the PatientConnecter™ -- PAC Trade Secrets.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

531.     ChatterPlug solely and exclusively owns all rights, title and interests in and to any tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of the PatientConnecter™ -- PAC Trade Secrets.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

532.     ChatterPlug is the origin of any related material, as set forth in the MCA. (Confidential Exhibit A (MCA), §§ 1 and 3.)

533.     ChatterPlug solely and exclusively owns all rights, title and interests in and to any related material, as set forth in the MCA.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

534.     At all relevant times, Digital Intent has known and currently knows that ChatterPlug solely and exclusively owns all rights, title and interests in and to (a) the PatientConnecter™ -- PAC Prototype, (b) any tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of the PatientConnecter™ -- PAC Trade Secrets and (c) any related material, as set forth in the MCA.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

535.     At all relevant times, Digital Intent has known and currently knows that, except for Digital Intent's very limited, non-commercial rights under the MCA, neither Digital Intent nor Kindred, individually or jointly, possesses any right, title or interest in or to (a) the PatientConnecter™ -- PAC Prototype, (b) any tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of the PatientConnecter™ -- PAC Trade Secrets or (c) any related material, as set forth in the MCA.  (Confidential Exhibit A (MCA), §§ 1, 3 and 5.)

536.     At all relevant times, Digital Intent has known and currently knows that only ChatterPlug is authorized to market, promote, offer, sell, license and otherwise transfer (a) the PatientConnecter™ -- PAC Prototype, (b) any tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of the PatientConnecter™ -- PAC Trade Secrets and (c) any related material, as set forth in the MCA.  (Confidential Exhibit A (MCA), p. 1, §§ 1-3, 6.9.)

537.     At all relevant times, Digital Intent has known and currently knows that neither Digital Intent nor Kindred, individually or jointly, has express or implied authority or consent to market, promote, offer, sell, license or otherwise transfer (a) the PatientConnecter™ -- PAC Prototype, (b) any tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of the PatientConnecter™ -- PAC Trade Secrets or (c) any

related material, as set forth in the MCA. (Confidential Exhibit A (MCA), p. 1, §§ 1-3, 6.9.)

538. Since April 1, 2015, Digital Intent has continued to work on, and currently is working on, the Kindred Project or a related commercial project.

539. On information and belief, on one or more occasions since April 1, 2015, Digital Intent falsely and deceptively has designated, in interstate commerce, that Digital Intent is the origin of (a) the PatientConnecter™ -- PAC Prototype, (b) one or more tools, products, applications, *a.k.a.* apps, prototypes or materials copied or substantially derived from one or both of the PatientConnecter™ -- PAC Trade Secrets, (c) related material, as set forth in the MCA, or (d) some combination thereof. (Confidential Exhibit A (MCA), §§ 1 and 3.)

540. On information and belief, on one or more occasions since April 1, 2015, Digital Intent falsely and deceptively has represented to Kindred, in interstate commerce, through Digital Intent's disclosure and use of (a) the Patient Connecter™ -- PAC Prototype, (b) one or more tools, products, applications, *a.k.a.* apps, prototypes or materials copied or substantially derived from one or both of the PatientConnecter™ -- PAC Trade Secrets, (c) related material, as set forth in the MCA, or (d) some combination thereof that Digital Intent is the origin of (a) the PatientConnecter™ -- PAC Prototype, (b) one or more tools, products, applications, *a.k.a.* apps, prototypes or materials copied or substantially derived from one or both of the PatientConnecter™ -- PAC Trade Secrets, (c) related material, as set forth in the MCA, or (d) some combination thereof. (Confidential Exhibit A (MCA), §§ 1 and 3.)

541. On information and belief, on one or more occasions since April 1, 2015, Digital Intent falsely and deceptively has represented to Kindred, in interstate commerce, through one or more written or oral statements, that Digital Intent is the owner of or authorized to market, promote, offer, sell, license or otherwise transfer and, as such, is the origin of (a) the

PatientConnecter™ -- PAC Prototype, (b) one or more tools, products, applications, *a.k.a.* apps, prototypes or materials copied or substantially derived from one or both of the PatientConnecter™ -- PAC Trade Secrets, (c) related material, as set forth in the MCA, or (d) some combination thereof.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

542.    On information and belief, one or more of Digital Intent's false and deceptive designations of origin, including one or more of its false and deceptive representations of origin, ownership or authorization to Kindred, were, are and will be likely to cause consumer confusion, including confusion to Kindred, one or more of its subsidiaries, affiliates or divisions or some combination of those persons, regarding the origin of (a) the PatientConnecter™ -- PAC Prototype, (b) one or more tools, products, applications, *a.k.a.* apps, prototypes or materials copied or substantially derived from one or both of the PatientConnecter™ -- PAC Trade Secrets, (c) related material, as set forth in the MCA, or (d) some combination thereof.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

543.    On information and belief, one or more of Digital Intent's false and deceptive designations of origin, including one or more of its false and deceptive representations of origin, ownership or authorization to Kindred, were, are and will be likely to cause consumer confusion, including confusion to one or more actual or prospective ChatterPlug investors, partners or clients or some combination of those persons, regarding the origin of (a) the PatientConnecter™ -- PAC Prototype, (b) one or more tools, products, applications, *a.k.a.* apps, prototypes or materials copied or substantially derived from one or both of the PatientConnecter™ -- PAC Trade Secrets, (c) related material, as set forth in the MCA, or (d) some combination thereof.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

544.    Digital Intent wrongly has profited, is profiting and will profit from one or more of

its false and deceptive designations of origin, including one or more of its false and deceptive representations of origin, ownership or authorization to Kindred.

545.    ChatterPlug has been, is being and will be harmed by one or more of Digital Intent's false and deceptive designations of origin, including one or more of its false and deceptive representations of origin, ownership or authorization to Kindred.

546.    The harm to ChatterPlug as a result of one or more of Digital Intent's false and deceptive designations of origin, including one or more of its false and deceptive representations of origin, ownership or authorization to Kindred, has included, includes and will include (a) monetary harm, including lost profits from, among other things, one or more written subscription or license agreements that were not entered into, (b) monetary or other harm from other lost or diminished commercial opportunities and (c) irreparable harm, including harm to, or deprivation of one or more opportunities to establish or enhance, ChatterPlug's goodwill, reputation and appeal, with or among one or more actual or prospective investors, partners or clients, as a pioneering start-up company with an innovative, digital, post-acute care, patient engagement and experience prototype, for which there is no adequate remedy at law.

547.    One or more of Digital Intent's false and deceptive designations of origin, including one or more of its false and deceptive representations of origin, ownership or authorization to Kindred, have had, are having and, unless enjoined, will continue to have a substantial economic effect on interstate commerce, including at least harm to ChatterPlug and unjust enrichment to Digital Intent.

### TWENTY-SIXTH CLAIM FOR RELIEF:
### UNFAIR COMPETITION BY DIGITAL INTENT AND KINDRED
### (false designation of origin, based on reverse palming off, under 15 U.S.C. § 1125(a))

548.    ChatterPlug re-alleges paragraphs 1 through 547 as if fully alleged herein.

549.    ChatterPlug is the origin of Maxwell.  (MCA, §§ 1 and 3.)

550.    ChatterPlug solely and exclusively owns all rights, title and interests in and to Maxwell.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

551.    At all relevant times, Digital Intent has known and currently knows that ChatterPlug solely and exclusively owns all rights, title and interests in and to Maxwell.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

552.    On information and belief, at all relevant times, Kindred has known and currently knows that ChatterPlug solely and exclusively owns all rights, title and interests in and to Maxwell.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

553.    At all relevant times, Digital Intent has known and currently knows that neither Digital Intent nor Kindred, individually or jointly, possesses any right, title or interest in or to Maxwell.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

554.    On information and belief, at all relevant times, Kindred has known and currently knows that neither Digital Intent nor Kindred, individually or jointly, possesses any right, title or interest in or to Maxwell.  (Confidential Exhibit A (MCA), §§ 1 and 3.)

555.    At all relevant times, Digital Intent has known and currently knows that only ChatterPlug is authorized to market, promote, offer, sell, license and otherwise transfer Maxwell.  (Confidential Exhibit A (MCA), p. 1, §§ 1-3, 6.9.)

556.    On information and belief, at all relevant times, Kindred has known and currently knows that only ChatterPlug is authorized to market, promote, offer, sell, license and otherwise transfer Maxwell.  (Confidential Exhibit A (MCA), p. 1, §§ 1-3, 6.9.)

557.    At all relevant times, Digital Intent has known and currently knows that neither Digital Intent nor Kindred, individually or jointly, has express or implied authority or consent to

market, promote, offer, sell, license or otherwise transfer Maxwell. (Confidential Exhibit A (MCA), p. 1, §§ 1-3, 6.9.)

558. On information and belief, at all relevant times, Kindred has known and currently knows that neither Digital Intent nor Kindred, individually or jointly, has express or implied authority or consent to market, promote, offer, sell, license or otherwise transfer Maxwell. (Confidential Exhibit A (MCA), p. 1, §§ 1-3, 6.9.)

559. On or around November 12, 2015, and since November 12, 2015, on one or more occasions, Kindred and Digital Intent jointly have disclosed Maxwell in interstate commerce, including publicly at the Kindred Symposium and on Kindred's website. (Exhibit K.)

560. On or around November 12, 2015, and since November, 12, 2015, on one or more occasions, Kindred and Digital Intent jointly have promoted and marketed Maxwell in interstate commerce, including publicly at the Kindred Symposium and on Kindred's website. (Exhibit K.)

561. On or around November 12, 2015, and since November, 12, 2015, on one or more occasions, Kindred and Digital Intent falsely, deceptively and jointly have designated, in interstate commerce, publicly or otherwise, that Kindred, Digital Intent or both are the origin of Maxwell. (Exhibit K; Confidential Exhibit A (MCA), §§ 1 and 3.)

562. On or around November 12, 2015, and since November, 12, 2015, on one or more occasions, Kindred and Digital Intent falsely, deceptively and jointly have represented to consumers, including one or more actual and prospective payers, partners, including hospitals, medical professionals, including physicians, and patients and their respective families and caregivers, in interstate commerce, publicly or otherwise, through Kindred and Digital Intent's joint disclosure of Maxwell, that Kindred, Digital Intent or both are the origin of Maxwell. (Exhibit K; Confidential Exhibit A (MCA), §§ 1 and 3.)

563. On or around November 12, 2015, and since November, 12, 2015, on one or more occasions, Kindred and Digital Intent falsely, deceptively and jointly have represented to consumers, including one or more actual or prospective payers, partners, including hospitals, medical professionals, including physicians, and patients and their respective families and caregivers, in interstate commerce, publicly or otherwise, through Kindred and Digital Intent's joint promotion and marketing of Maxwell, that Kindred, Digital Intent or both are the origin of Maxwell. (Exhibit K; Confidential Exhibit A (MCA), §§ 1 and 3.)

564. On or around November 12, 2015, and since around November, 12, 2015, on one or more occasions, Kindred and Digital Intent, falsely, deceptively and jointly have represented to consumers, including one or more actual or prospective payers, partners, including hospitals, medical professionals, including physicians, and patients and their respective families and caregivers, in interstate commerce, publicly or otherwise, through one or more written or oral statements, that Kindred, Digital Intent or both are the owner of or authorized to market, promote, offer, sell, license or otherwise transfer and, as such, are the origin of Maxwell. (Exhibit K; Confidential Exhibit A (MCA), §§ 1 and 3.)

565. Kindred's statement, during the Kindred Symposium, that Zachariah "worked with Digital Intent, a Chicago-based company, on the design" of Maxwell was and is a false and deceptive representation of origin, ownership or authorization and a false and deceptive designation of origin as to Maxwell. (Exhibit K; Confidential Exhibit A (MCA), §§ 1 and 3.)

566. Digital Intent, through Katz, was present when Kindred falsely and deceptively stated, during the Kindred Symposium, that Zachariah "worked with Digital Intent, a Chicago-based company, on the design" of Maxwell. (Exhibit K.)

567. Kindred's statement, on its website, that Zachariah "worked with Digital Intent, a

Chicago-based company, on the design" of Maxwell was and is a false and deceptive representation of origin, ownership or authorization and a false and deceptive designation of origin as to Maxwell. (Exhibit K; Confidential Exhibit A (MCA), §§ 1 and 3.)

568.    At all relevant times, Digital Intent has been and is aware of Kindred's false and deceptive representations of origin, ownership or authorization and false and deceptive designations of origin as to Maxwell.

569.    Digital Intent has approved all of Kindred's false and deceptive representations of origin, ownership or authorization and false and deceptive designations of origin as to Maxwell.

570.    Digital Intent never has requested any correction to or retraction of any of Kindred's false and deceptive representations of origin, ownership or authorization or false and deceptive designations of origin as to Maxwell.

571.    On information and belief, one or more of Kindred and Digital Intent's false, deceptive and joint designations of origin, including one or more of their false, deceptive and joint representations of origin, were, are and will be likely to cause consumer confusion regarding the origin of Maxwell, including confusion to one or more actual or prospective (a) ChatterPlug investors, partners or clients or (b) payers, partners, including hospitals, medical professionals, including physicians, and patients and their respective families and caregivers. (Confidential Exhibit A (MCA), §§ 1 and 3.)

572.    On information and belief, one or more of Kindred's false and deceptive designations of origin, including one or more of its false and deceptive representations of origin, ownership or authorization, which designations and representations Digital Intent has approved and never requested correction to or retraction of, were, are and will be likely to cause consumer confusion regarding the origin of Maxwell, including confusion to one or more actual or

prospective (a) ChatterPlug investors, partners or clients or (b) payers, partners, including hospitals, medical professionals, including physicians, and patients and their respective families and caregivers. (Confidential Exhibit A (MCA), §§ 1 and 3.)

573. Kindred and Digital Intent, individually and jointly, wrongly have profited, are profiting and will profit from one or more of (a) their false, deceptive and joint designations of origin, including one or more of their false, deceptive and joint representations of origin, and (b) Kindred's false and deceptive designations of origin, including one or more of its false and deceptive representations of origin, ownership or authorization, which Digital Intent approved and never requested correction to or retraction of.

574. ChatterPlug has been, is being and will be harmed by one or more of (a) Kindred and Digital Intent's false, deceptive and joint designations of origin, including one or more of their false, deceptive and joint representations of origin, and (b) Kindred's false and deceptive designations of origin, including one or more of its false and deceptive representations of origin, ownership or authorization, which Digital Intent approved and never requested correction to or retraction of.

575. The harm to ChatterPlug as a result of one or more of (a) Kindred and Digital Intent's false, deceptive and joint designations of origin, including one or more of their false, deceptive and joint representations of origin, and (b) Kindred's false and deceptive designations of origin, including one or more of its false and deceptive representations of origin, ownership or authorization, which Digital Intent approved and never requested correction to or retraction of, has included, includes and will include (i) monetary harm, including lost profits from, among other things, one or more written subscription or license agreements that were not entered into, (ii) monetary or other harm from other lost or diminished commercial opportunities and, (iii)

irreparable harm, including harm to, or deprivation of one or more opportunities to establish or enhance, ChatterPlug's goodwill, reputation and appeal, with or among one or more actual or prospective (A) investors, partners or clients or (B) payers, partners, including hospitals, medical professionals, including physicians, and patients and their respective families and caregivers, as a pioneering start-up company with an innovative, digital, post-acute care, patient engagement and experience prototype or tool, for which there is no adequate remedy at law.

576. One or more of (a) Kindred and Digital Intent's false, deceptive and joint designations of origin, including one or more of their false, deceptive and joint representations of origin, and (b) Kindred's false and deceptive designations of origin, including one or more of its false and deceptive representations of origin, ownership or authorization, which Digital Intent approved and never requested correction to or retraction of, have had, are having and, unless enjoined, will continue to have a substantial economic effect on interstate commerce, including at least harm to ChatterPlug and unjust enrichment to Kindred and Digital Intent.

**TWENTY-SEVENTH CLAIM FOR RELIEF:**
**UNFAIR COMPETITION BY KINDRED**
**(false designation of origin, based on reverse palming off, under 15 U.S.C.**
**§ 1125(a))**

577. ChatterPlug re-alleges paragraphs 1 through 576 as if fully alleged herein.

578. On information and belief, at all relevant times, Kindred has known and currently knows that ChatterPlug solely and exclusively owns all rights, title and interests in and to (a) the PatientConnecter™ -- PAC Prototype, (b) any tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of the PatientConnecter™ -- PAC Trade Secrets and (c) any related material, as set forth in the MCA. (Confidential Exhibit A (MCA), §§ 1 and 3.)

579. On information and belief, at all relevant times, Kindred has known and currently

89

knows that, except for Digital Intent's very limited, non-commercial rights under the MCA, neither Digital Intent nor Kindred, individually or jointly, possesses any right, title or interest in or to (a) the PatientConnecter™ -- PAC Prototype, (b) any tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of the PatientConnecter™ -- PAC Trade Secrets or (c) any related material, as set forth in the MCA. (Confidential Exhibit A (MCA), §§ 1, 3 and 5.)

580.    On information and belief, at all relevant times, Kindred has known and currently knows that only ChatterPlug is authorized to market, promote, offer, sell, license and otherwise transfer (a) the PatientConnecter™ -- PAC Prototype, (b) any tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of the PatientConnecter™ -- PAC Trade Secrets and (c) any related material, as set forth in the MCA. (Confidential Exhibit A (MCA), p. 1, §§ 1-3, 6.9.)

581.    On information and belief, at all relevant times, Kindred has known and currently knows that neither Digital Intent nor Kindred, individually or jointly, has express or implied authority or consent to market, promote, offer, sell, license or otherwise transfer (a) the PatientConnecter™ -- PAC Prototype, (b) any tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of the PatientConnecter™ -- PAC Trade Secrets or (c) any related material, as set forth in the MCA. (Confidential Exhibit A (MCA), p. 1, §§ 1-3, 6.9.)

582.    Since April 1, 2015, Kindred has continued to work on, and currently is working on, the Kindred Project or a related commercial project.

583.    On information and belief, on one or more occasions since April 1, 2015, Kindred falsely and deceptively has designated, in interstate commerce, publicly or otherwise, that Kindred

is the origin of (a) the PatientConnecter™ -- PAC Prototype, (b) Maxwell, (c) one or more other tools, products, applications, *a.k.a.* apps, prototypes or materials copied or substantially derived from one or both of the PatientConnecter™ -- PAC Trade Secrets, (d) other related material, as set forth in the MCA, or (e) some combination thereof. (Confidential Exhibit A (MCA), §§ 1 and 3.)

584.    During the Kindred Symposium, Kindred, through Zachariah, stated that Kindred, through Zachariah, developed Maxwell by "[b]uilding on what [Zachariah] knew as a healthcare professional and a consumer[.]" (Exhibit K.)

585.    Kindred's statement, during the Kindred Symposium, that Kindred, through Zachariah, developed Maxwell by "[b]uilding on what [Zachariah] knew as a healthcare professional and a consumer" was and is a false and deceptive representation of origin, ownership or authorization and a false and deceptive designation of origin as to Maxwell. (Exhibit K; Confidential Exhibit A (MCA), §§ 1 and 3.)

586.    On Kindred's website, Kindred has stated and is stating that Kindred, through Zachariah, developed Maxwell by "[b]uilding on what [Zachariah] knew as a healthcare professional and a consumer[.]" (Exhibit K.)

587.    Kindred's statement, on its website, that Kindred, through Zachariah, developed Maxwell by "[b]uilding on what [Zachariah] knew as a healthcare professional and a consumer" was and is a false and deceptive representation of origin, ownership or authorization and a false and deceptive designation of origin as to Maxwell. (Exhibit K; Confidential Exhibit A (MCA), §§ 1 and 3.)

588.    During the Kindred Symposium, Kindred, through Zachariah, stated that "Zachariah focused on making the [Maxwell] interface intuitive and simple and able to provide meaningful information that could be shared." (Exhibit K.)

589.     Kindred's statement, during the Kindred Symposium, that "Zachariah focused on making the [Maxwell] interface intuitive and simple and able to provide meaningful information that could be shared" was and is a false and deceptive representation of origin, ownership or authorization and a false and deceptive designation of origin as to Maxwell.  (Exhibit K; Confidential Exhibit A (MCA), §§ 1 and 3.)

590.     On Kindred's website, Kindred has stated and is stating that "Zachariah focused on making the [Maxwell] interface intuitive and simple and able to provide meaningful information that could be shared."  (Exhibit K.)

591.     Kindred's statement, on its website, that "Zachariah focused on making the [Maxwell] interface intuitive and simple and able to provide meaningful information that could be shared" was and is a false and deceptive representation of origin, ownership or authorization and a false and deceptive designation of origin as to Maxwell.  (Exhibit K; Confidential Exhibit A (MCA), §§ 1 and 3.)

592.     On information and belief, one or more of Kindred's false and deceptive designations of origin, including one or more of its false and deceptive representations of origin, ownership or authorization, were, are and will be likely to cause consumer confusion, including confusion to one or more actual or prospective (a) ChatterPlug investors, partners or clients or (b) payers, partners, including hospitals, medical professionals, including physicians, and patients and their respective families and caregivers, regarding the origin of (i) Maxwell, (ii) the PatientConnecter™ -- PAC Prototype, (iii) any other tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of the PatientConnecter™ -- PAC Trade Secrets, (iv) any other related material, as set forth in the MCA (Confidential Exhibit A (MCA), §§ 1 and 3), or (v) some combination thereof.

593.    Kindred wrongly has profited, is profiting and will profit from one or more of its false and deceptive designations of origin, including one or more of its false and deceptive representations of origin, ownership or authorization.

594.    ChatterPlug has been, is being and will be harmed by one or more of Kindred's false and deceptive designations of origin, including one or more of its false and deceptive representations of origin, ownership or authorization.

595.    The harm to ChatterPlug as a result of one or more of Kindred's false and deceptive designations of origin, including one or more of its false and deceptive representations of origin, ownership or authorization, has included, includes and will include (a) monetary harm, including lost profits from, among other things, one or more written subscription or license agreements that were not entered into, (b) monetary or other harm from other lost or diminished commercial opportunities and (c) irreparable harm, including harm to, or deprivation of one or more opportunities to establish or enhance, ChatterPlug's goodwill, reputation and appeal, with or among one or more actual or prospective (i) investors, partners or clients or (ii) payers, partners, including hospitals, medical professionals, including physicians, and patients and their respective families and caregivers, as a pioneering start-up company with an innovative, digital, post-acute care, patient engagement and experience prototype or tool, for which there is no adequate remedy at law.

596.    One or more of Kindred's false and deceptive designations of origin, including one or more of its false and deceptive representations of origin, ownership or authorization, have had, are having and, unless enjoined, will continue to have a substantial economic effect on interstate commerce, including at least harm to ChatterPlug and unjust enrichment to Kindred.

## PRAYER FOR RELIEF

WHEREFORE, ChatterPlug, Inc. respectfully requests that this Court enter a judgment and corresponding orders for ChatterPlug, Inc. and against Digital Intent, LLC and Kindred Healthcare, Inc. as follows:

a.        A judgment finding Digital Intent LLC liable to ChatterPlug, Inc. for (i) trade secret misappropriation, namely, Digital Intent, LLC's actual, threatened and inevitable misappropriation of ChatterPlug, Inc.'s PatientConnecter™ -- PAC Tool and PatientConnecter™ -- PAC Prototype (collectively, the "PatientConnecter™ – PAC Trade Secrets"), (ii) breach of contract, namely, Digital Intent, LLC's breaches of the Mutual Confidentiality Agreement between ChatterPlug, Inc. and Digital Intent, LLC  (the "MCA"), (iii) breach of oral contract, namely, Digital Intent, LLC's breach of the oral contract between ChatterPlug, Inc. and Digital Intent, LLC, and (iv) unfair competition, namely, Digital Intent, LLC's false designations of origin based on reverse palming off of (1) Maxwell, (2) ChatterPlug, Inc.'s PatientConnecter™ -- PAC Prototype, (3) any other tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of ChatterPlug, Inc.'s PatientConnecter™ -- PAC Trade Secrets, (4) any other related material, as set forth in the MCA (MCA, §§ 1 and 3), or (5) any combination thereof;

b.        A judgment finding that ChatterPlug, Inc. is entitled to Digital Intent, LLC's specific performance under and compliance with the MCA and ordering Digital Intent, LLC to immediately and specifically perform under and comply with the MCA, including the 1st, 3rd, 4th and 6th sentences of section 2 of the MCA.  (MCA, p. 1 and § 2, 1st, 3rd, 4th and 6th sentences.)

c.        A judgment finding Kindred Healthcare, Inc. liable to ChatterPlug, Inc. for (i) trade secret misappropriation, namely, Kindred Healthcare, Inc.'s actual, threatened and inevitable misappropriation of ChatterPlug, Inc.'s PatientConnecter™ – PAC Trade Secrets, (ii) tortious

interference with contract, namely, Kindred Healthcare, Inc.'s tortious interference with the MCA, and (iii) unfair competition, namely, Kindred Healthcare, Inc.'s false designations of origin based on reverse palming off of (1) Maxwell, (2) ChatterPlug, Inc.'s PatientConnecter™ -- PAC Prototype, (3) any other tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of ChatterPlug, Inc.'s PatientConnecter™ -- PAC Trade Secrets, (4) any other related material, as set forth in the MCA (MCA, §§ 1 and 3), or (5) any combination thereof;

d.      A preliminary and permanent injunction enjoining Digital Intent, LLC, its directors, officers, principals, members, agents, servants, employees, attorneys, affiliated companies, assigns and successors in interest, and all persons in active concert or participation with any of them, from all further and continued (i) actual, threatened and inevitable trade secret misappropriation, namely, unauthorized acquisition, disclosure or use, of any of ChatterPlug, Inc.'s PatientConnecter™ – PAC Trade Secrets, including all further and continued unauthorized acquisition, disclosure or use of (1) Maxwell, (2) any other tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of ChatterPlug, Inc.'s PatientConnecter™ -- PAC Trade Secrets, (3) any other related material, as set forth in the MCA, (MCA, §§ 1 and 3) or (4) any combination thereof, (ii) breaches of contract, namely, the MCA, and (iii) unfair competition, namely, false designations of origin based on reverse palming off of (1) Maxwell, (2) ChatterPlug, Inc.'s PatientConnecter™ -- PAC Prototype, (3) any other tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of ChatterPlug, Inc.'s PatientConnecter™ -- PAC Trade Secrets, (4) any other related material, as set forth in the MCA (MCA, §§ 1 and 3), or (5) any combination thereof;

e.      A preliminary and permanent injunction enjoining Kindred Healthcare, Inc., its

directors, officers, principals, members, agents, servants, employees, attorneys, affiliated companies, assigns and successors in interest, and all persons in active concert or participation with any of them, from all further and continued (i) actual, threatened and inevitable trade secret misappropriation, namely, unauthorized acquisition, disclosure or use, of any of ChatterPlug, Inc.'s PatientConnecter™ – PAC Trade Secrets, including all further and continued unauthorized acquisition, disclosure or use of (1) Maxwell, (2) any other tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of ChatterPlug, Inc.'s PatientConnecter™ -- PAC Trade Secrets, (3) any other related material, as set forth in the MCA (MCA, §§ 1 and 3), or (4) any combination thereof, (ii) tortious interference with contract, namely, the MCA, and (iii) unfair competition, namely, false designations of origin based on reverse palming off of (1) Maxwell, (2) ChatterPlug, Inc.'s PatientConnecter™ -- PAC Prototype, (3) any other tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of ChatterPlug, Inc.'s PatientConnecter™ -- PAC Trade Secrets, (4) any other related material, as set forth in the MCA (MCA, §§ 1 and 3), or (5) any combination thereof;

f.      A judgment ordering Digital Intent, LLC to publish, at its cost, within seven days, on its website, where it shall remain for at least one year, and in electronic and print versions of a newspaper and a trade publication at ChatterPlug, Inc.'s choosing, a written statement, pre-approved by ChatterPlug, Inc., correcting all of Digital Intent, LLC's false designations of origin based on reverse palming off of (1) Maxwell, (2) ChatterPlug, Inc.'s PatientConnecter™ -- PAC Prototype, (3) any other tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of ChatterPlug, Inc.'s PatientConnecter™ -- PAC Trade Secrets, (4) any other related material, as set forth in the MCA (MCA, §§ 1 and 3), or (5) any combination thereof;

g.        A judgment ordering Kindred Healthcare, Inc. to publish, at its cost, within seven days, on its website, where it shall remain for one year, and in electronic and print versions of a newspaper and a trade publication at ChatterPlug, Inc.'s choosing, a written statement, pre-approved by ChatterPlug, Inc., correcting all of Kindred Healthcare, Inc.'s false designations of origin based on reverse palming off of (1) Maxwell, (2) ChatterPlug, Inc.'s PatientConnecter™ -- PAC Prototype, (3) any other tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of ChatterPlug, Inc.'s PatientConnecter™ -- PAC Trade Secrets, (4) any other related material, as set forth in the MCA (MCA, §§ 1 and 3), or (5) any combination thereof;

h.        A judgment finding ChatterPlug, Inc. to be the sole and exclusive owner of (1) Maxwell, (2) any other tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of ChatterPlug, Inc.'s PatientConnecter™ -- PAC Trade Secrets by Digital Intent, LLC, Kindred Healthcare, Inc. or both, (3) any other related material, as set forth in the MCA (MCA, §§ 1 and 3), and (4) any combination thereof;

i.        A judgment finding ChatterPlug, Inc. to be the prevailing party;

j.        A judgment ordering Digital Intent, LLC, at its cost, to (i) inventory, in writing and within ten days, all versions and copies, regardless of form or medium, of (1) each of ChatterPlug, Inc.'s PatientConnecter™ -- PAC Trade Secrets, (2) Maxwell, (3) any other tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of ChatterPlug, Inc.'s PatientConnecter™ -- PAC Trade Secrets, (4) any other related material, as set forth in the MCA (MCA, §§ 1 and 3) or (5) any combination thereof in the possession, custody or control of Digital Intent, LLC, (ii) immediately provide ChatterPlug, Inc. a verified copy of the written inventory and (iii) at ChatterPlug, Inc.'s option, destroy, delete or return

to ChatterPlug, Inc. all such versions and copies;

k.      A judgment ordering Kindred Healthcare, Inc., at its cost, to (i) inventory, in writing and within ten days, all versions and copies, regardless of form or medium, of (1) each of ChatterPlug, Inc.'s PatientConnecter™ -- PAC Trade Secrets, (2) Maxwell, (3) any other tool, product, application, *a.k.a.* app, prototype or material copied or substantially derived from one or both of ChatterPlug, Inc.'s PatientConnecter™ -- PAC Trade Secrets, (4) any other related material, as set forth in the MCA (MCA, §§ 1 and 3) or (5) any combination thereof in the possession, custody or control of Kindred Healthcare, Inc., (ii) immediately provide ChatterPlug, Inc. a verified copy of the written inventory and (iii) at ChatterPlug, Inc.'s option, destroy, delete or return to ChatterPlug, Inc. all such versions and copies;

l.      A judgment awarding ChatterPlug, Inc. monetary damages, namely (1) compensation for all actual losses caused by Digital Intent, LLC's actual, threatened and inevitable misappropriation of one or both of ChatterPlug, Inc.'s PatientConnecter™ – PAC Trade Secrets, (2) all unjust enrichment to Digital Intent, LLC caused by the misappropriation and not taken into account in computing actual losses and (3) as appropriate, a reasonable royalty for the misappropriation through unauthorized disclosure or use;

m.      A judgment awarding ChatterPlug, Inc. monetary damages, namely (1) compensation for all actual losses caused by Kindred Healthcare, Inc.'s actual, threatened and inevitable misappropriation of one or both of ChatterPlug, Inc.'s PatientConnecter™ – PAC Trade Secrets, (2) all unjust enrichment to Kindred Healthcare, Inc. caused by the misappropriation and not taken into account in computing actual losses and (3) as appropriate, a reasonable royalty for the misappropriation through unauthorized disclosure or use;

n.      A judgment awarding ChatterPlug, Inc. monetary damages, namely, (1)

compensation for all losses caused by or flowing from any of Digital Intent, LLC's breaches of the MCA and (2) all unjust enrichment to Digital Intent, LLC caused by or flowing from any of the breaches of the MCA;

      o.     A judgment awarding ChatterPlug, Inc. monetary damages, namely, (1) compensation for all losses caused by or flowing from any of Kindred Healthcare, Inc.'s tortious interference with the MCA and (2) all unjust enrichment to Kindred Healthcare, Inc. caused by or flowing from any of the tortious interference with the MCA;

      p.     A judgment awarding ChatterPlug, Inc. monetary damages, namely, (1) compensation for all losses caused by or flowing from Digital Intent, LLC's breach of the oral contract between ChatterPlug, Inc. and Digital Intent, LLC and (2) all unjust enrichment to Digital Intent, LLC caused by or flowing from the breach of the oral contract;

      q.     A judgment awarding ChatterPlug, Inc. monetary damages, namely, (1) Digital Intent LLC's profits and (2) all damages sustained by ChatterPlug, Inc. as a result of Digital Intent, LLC's unfair competition, namely, (a) Digital Intent, LLC's false designations of origin based on reverse palming off and (b) Digital Intent, LLC and Kindred Healthcare, Inc.'s false designations of origin based on reverse palming off, pursuant to 15 U.S.C. § 1117(a);

      r.     A judgment awarding ChatterPlug, Inc. monetary damages, namely, (1) Kindred Healthcare, Inc.'s profits and (2) all damages sustained by ChatterPlug, Inc. as a result of Kindred Healthcare, Inc.'s unfair competition, namely, (a) Kindred Healthcare, Inc.'s false designations of origin based on reverse palming off and (b) Digital Intent, LLC and Kindred Healthcare, Inc.'s false designations of origin based on reverse palming off, pursuant to 15 U.S.C. § 1117(a);

      s.     A judgment finding Digital Intent, LLC's misappropriation of each of ChatterPlug, Inc.'s PatientConnecter™ – PAC Trade Secrets to have been and be willful and

malicious;

t.      A judgment finding Kindred Healthcare, Inc.'s misappropriation of each of ChatterPlug, Inc.'s PatientConnecter™ – PAC Trade Secrets to have been and be willful and malicious;

u.      A judgment finding each of Digital Intent, LLC's breaches of the MCA to have been and be willful, malicious, in bad faith, outrageous and with reckless indifference to ChatterPlug, Inc.'s rights and interests;

v.      A judgment finding Digital Intent, LLC's breach of the oral contract between ChatterPlug, Inc. and Digital Intent, LLC to have been and be willful, malicious, in bad faith, outrageous and with reckless indifference to ChatterPlug, Inc.'s rights and interests;

w.      A judgment finding Kindred Healthcare, Inc.'s tortious interference with the MCA, including each of its intentional and unjustifiable inducing acts, to have been and be malicious, in bad faith, outrageous, with intent to substantially, actually and irreparably injure ChatterPlug, Inc. and its rights and interests, and committed with reckless indifference to ChatterPlug, Inc.'s rights and interests;

x.      A judgment finding this case to be an exceptional case;

y.      A judgment awarding ChatterPlug, Inc. exemplary damages of twice the amount of compensatory, unjust enrichment and reasonable royalty damages awarded for Digital Intent, LLC's actual, threatened and inevitable misappropriation of one or both of ChatterPlug, Inc.'s PatientConnecter™ – PAC Trade Secrets, pursuant to at least 765 ILCS § 1065/4;

z.      A judgment awarding ChatterPlug, Inc. exemplary damages of twice the amount of compensatory, unjust enrichment and reasonable royalty damages awarded for Kindred Healthcare, Inc.'s actual, threatened and inevitable misappropriation of one or both of ChatterPlug,

Inc.'s PatientConnecter™ – PAC Trade Secrets, pursuant to at least 765 ILCS § 1065/4;

aa.    A judgment awarding ChatterPlug, Inc. punitive damages for Digital Intent, LLC's breaches of the MCA;

bb.    A judgment awarding ChatterPlug, Inc. punitive damages for Kindred Healthcare, Inc.'s tortious interference with the MCA;

cc.    A judgment awarding ChatterPlug, Inc. punitive damages for Digital Intent, LLC's breach of the oral contract between ChatterPlug, Inc. and Digital Intent, LLC;

dd.    A judgment awarding ChatterPlug, Inc. enhanced damages of three times the actual damages awarded as a result of Digital Intent, LLC's unfair competition, namely, (i) Digital Intent, LLC's false designations of origin based on reverse palming off and (ii) Digital Intent, LLC and Kindred Healthcare, Inc.'s false designations of origin based on reverse palming off, pursuant to 15 U.S.C. § 1117(a);

ee.    A judgment awarding ChatterPlug, Inc. enhanced damages of three times the actual damages awarded as a result of Kindred Healthcare, Inc.'s unfair competition, namely, (i) Kindred Healthcare, Inc.'s false designations of origin based on reverse palming off and (ii) Digital Intent, LLC and Kindred Healthcare, Inc.'s false designations of origin based on reverse palming off, pursuant to 15 U.S.C. § 1117(a);

ff.    A judgment awarding ChatterPlug, Inc. its attorneys' fees, pursuant to at least 765 ILCS § 1065/5 and Federal Rule of Civil Procedure 54;

gg.    A judgment awarding ChatterPlug, Inc. its attorneys' fees, pursuant to at least 15 U.S.C. § 1117(a) and Federal Rule of Civil Procedure 54;

hh.    A judgment awarding ChatterPlug, Inc. its attorneys' fees as a result of Digital Intent, LLC's willful, malicious, bad faith, outrageous and reckless acts and failures to act,

pursuant to at least Federal Rule of Civil Procedure 54;

ii.     A judgment awarding ChatterPlug, Inc. its attorneys' fees as a result of Kindred Healthcare, Inc.'s intentional, unjustifiable, malicious, bad faith, outrageous and reckless acts and failures to act, pursuant to at least Federal Rule of Civil Procedure 54;

jj.     A judgment awarding ChatterPlug, Inc. all of its costs incurred in this action, pursuant to at least Federal Rule of Civil Procedure 54, 28 U.S.C. § 1920 and 15 U.S.C. § 1117(a);

kk.     A judgment awarding ChatterPlug, Inc. pre-judgment interest on all monetary damages, exemplary damages, punitive damages, enhanced damages, attorneys' fees and costs awarded;

ll.     A judgment awarding ChatterPlug, Inc. post-judgment interest on all monetary damages, exemplary damages, punitive damages, enhanced damages, attorneys' fees and costs awarded;

mm.     A judgment finding that Digital Intent, LLC and Kindred Healthcare, Inc. are jointly and severally liable for all monetary damages, exemplary damages, punitive damages, enhanced damages, attorneys' fees, costs, pre-judgment interest, post-judgment interest and all other relief awarded to ChatterPlug, Inc.; and

nn.     Such other legal and equitable relief that is available and which the Court deems proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff ChatterPlug, Inc. demands a jury trial on all issues so triable.

Dated: April 5, 2016

Respectfully submitted,

PELLETIER LAW, LLC

By: /s/ Dean A. Pelletier
Dean A. Pelletier
IL Bar No. 6230024
N.D. IL Trial Bar Member

Pelletier Law, LLC
150 South Wacker Drive
Suite 2400
Chicago, Illinois 60606
(773) 472-7777
dpelletier@pelletier-ip.com

*Attorneys for Plaintiff ChatterPlug, Inc.*